1   LUANNE SACKS (SBN 120811)
    Email: lsacks@srclaw.com
2   **SACKS, RICKETTS & CASE, LLP**
    177 Post Street, Suite 650
3   San Francisco, CA 94108
    Phone: 415.549.0580
4   Fax: 415.549.0640

5   CYNTHIA A. RICKETTS (*Admitted Pro Hac Vice*)
    Email: cricketts@srclaw.com
6   **SACKS, RICKETTS & CASE, LLP**
    2800 North Central Avenue, Suite 1230
7   Phoenix, AZ 85004
    Phone: 602.385.3370
8   Fax: 602.385.3371

9   [Additional counsel listed on Signature Page]

10  Attorneys for Defendant
    Massage Envy Franchising, LLC
11

12

13                  UNITED STATES DISTRICT COURT

14                 SOUTHERN DISTRICT OF CALIFORNIA

15  GAIL HAHN, CHAILLE DUNCAN,          | Case No. 12-CV-153-DMS (BGS)
    and ALEXIS HERNANDEZ,
16  individually and on behalf of all other | **MASSAGE ENVY FRANCHISING,**
    similarly situated California residents, | **LLC'S MEMORANDUM OF**
17                                       | **CONTENTIONS OF FACT AND**
                                          | **LAW**
                Plaintiff,
18                                       | The Hon. Dana M. Sabraw
           v.
19                                       | Pretrial Conference: October 31, 2014
    MASSAGE ENVY FRANCHISING,            | Time: 10:30 a.m.
20  LLC, a Delaware limited liability    | Courtroom: 13A
    company;
21
                Defendants.
22                                       | **\*\*REDACTED\*\***

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................. 1

II.   SUMMARY OF COURT'S PRIOR DECISIONS ............................... 4

III.  OPERATIVE CONTENTIONS OF FACT ........................................ 6

      A.   The Massage Envy Franchise System ................................... 6

      B.   The Benefits Of Membership ................................................. 7

      C.   No Uniform Membership Pricing .......................................... 8

      D.   No Uniform Membership Agreement .................................... 9

      E.   Plaintiff Gail Hahn ............................................................. 11

      F.   Plaintiff Alexis Hernandez ................................................. 12

      G.   Plaintiff Chaille Duncan .................................................... 14

      H.   Class Member Benefits on Services Received and Retail and Service
           Discounts ............................................................................ 15

      I.   Potential Windfall for Class Members Who Already Received More
           Than They Paid ................................................................... 18

      J.   Plaintiffs' Valuation of Their Member Benefits .................. 19

IV.   ADDITIONAL PARTICULAR ITEMS PURSUANT TO LOCAL RULE
      16.1(f)(3)(c):  CONTRACT CASE ................................................... 20

V.    CONTENTIONS OF LAW ............................................................... 20

      A.   Restitution: Legal Principles ............................................... 21

      B.   This Court Should Use Its Broad Discretion to Deny Any Amount of
           Restitution ........................................................................... 23

      C.   Even if Plaintiffs Meet Their Burden, Any Restitution Should Be
           Limited to Restoring the Massage Services That Plaintiffs Claim to
           Have Lost ............................................................................. 23

      D.   Even if Plaintiffs Could Meet Their Reinstatement Burden, Plaintiffs
           Have Not Demonstrated That MEF Can Be Ordered to Reinstate
           Member Services .................................................................. 26

      E.   If Monetary Restitution Is Allowed, It Must Be Limited to the
           Difference Between What Plaintiffs Paid And the Value of What
           Plaintiffs Received .............................................................. 27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    1.    Plaintiffs Cannot Meet Their Burden of Proving Restitution By Pointing in The Aggregate to Monthly Membership Dues Paid ... 28

    2.    Plaintiffs' Restitution Analysis Improperly Fails to Account for the Varying Membership Dues Paid by Class Members ............... 28

    3.    Plaintiffs' Restitution Analysis Improperly Fails to Account for the Value of the Member Benefits They Received ........................ 29

F.    It is Not Possible to Adjudicate Monetary Restitution on a Class-Wide Basis Here Consistent With Rule 23 and Due Process ........................... 34

    1.    Plaintiffs Must Propose a Workable Trial Plan ............................ 34

    2.    Plaintiffs' "Fluid Recovery" Model Is Inapposite Here, and Violates Rule 23 and Due Process ................................................. 37

G.    Appropriate Offsets Must Be Determined Before Plaintiffs Are Entitled to Any Monetary Restitution Award ........................................................ 42

H.    Any Monetary Restitution Award Cannot Exceed the Royalty Amount That MEF Received .................................................................................. 43

I.    Plaintiffs' Lack of a Class-wide Restitution Model and Failure to Prove Each Requirement in Rule 23 (including Typicality and Predominance) Warrants Decertification ........................................................................ 45

J.    Plaintiffs Cannot Meet Their Burden That They Are Entitled to Injunctive Relief ................................................................................... 46

K.    Plaintiffs Are Not Entitled to Prospective Injunctive Relief ................... 47

VI.    ABANDONED ISSUES ........................................................................................ 48

VII.    EXHIBITS ............................................................................................................ 49

VIII.    WITNESSES ......................................................................................................... 49

IX.    CONCLUSION .................................................................................................... 49

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

4

**Cases**

5

*Akkerman v. Mecta Corp., Inc.*, 152 Cal. App. 4th 1094 (2007) .................................................. 22, 45

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................................ 37

6

*Badella v. Deniro Mktg. LLC*, 2011 U.S. Dist. LEXIS 128145 (N.D. Cal. Nov. 4, 2011) ................. 35

*Baggett v. Hewlett-Packard Co.*, No. SACV070667AGRNBX, 2009 WL 3178066 (C.D. Cal. Sept.

7

    29, 2009) ............................................................................................................................ 24

*Baugh v. CBS, Inc.*, 828 F. Supp. 745 (N.D. Cal. 1993) .............................................................. 25

8

*Bird Hotel Corp. v. Super 8 Motels, Inc.*, CIV 06-4073, 2010 WL 572741 (D. S.D. Feb. 16, 2010) . 27

*Bowler v. Home Depot USA Inc.*, C-09-05523 JCS, 2011 WL 166140 (N.D. Cal. Jan. 19, 2011) 46, 47

9

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 2013)........................... 41

*Bruno v. Superior Court*, 127 Cal. App. 3d 120  (1981) .............................................................. 38

10

*Caldera v. J.M. Smucker Co.*, No. 12-4936-GHK, 2014 WL 1477400 (C.D. Cal. April 15, 2014)... 22,

    34, 43

11

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) .................................................................. 39

*Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005) ....................................................... 36

12

*Clark v. Superior Court*, 50 Cal. 4th 605 (2010) ....................................................................... 21

*Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663 (2006).......................................... 2, 20

13

*Comcast v. Behrend*, 133 S. Ct. 1426 (2013)..................................................................... 26, 37, 45

*Corbett v. Superior Court*, 101 Cal. App. 4th 649 (2002) ............................................................ 42

14

*Cortez v. Purolator Air Filtration Prods., Inc.*, 23 Cal. 4th 163 (2000)........................... 2, 21, 22, 23

*Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1 (2014) .................................................. 35, 36, 39, 42

15

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 338 (2006).............................................................. 48

*Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013) ................................................ 35

16

*Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997 (2005) ............................ 39, 42

*Haley v. Medtronic, Inc.*, 169 F.R.D. 643 (C.D. Cal. 1996) .......................................................... 37

17

*Hanna v. Plumer*, 380 U.S. 460 (1965) .................................................................................... 42

*Hickory Secs. Ltd. v. Rep. of Arg.*, 493 F. App'x 156 (2d Cir. 2012) .............................................. 41

18

*Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169 (3d Cir. 2009)............................................ 35, 36

*In re Facebook, Inc. v. PPC Adver. Litig.*, 282 F.R.D. 446 (N.D. Cal. April 13, 2012)............ 2, 22, 27

19

*In re Google Ad Words Litig.*, No. 08-3369, 2012 WL 28068 (N.D. Cal. Jan. 5, 2012) ............... 22, 45

*In re Hotel Charges*, 500 F.3d 86 (9th Cir. 1974) .............................................................. 3, 40, 42

20

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002)... 36

*In re Pom Wonderful*, No. ML-10-02199, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014).......... passim

21

*In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) ......................................................... 22, 26

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) ..................................... passim

22

*Kraus v. Trinity Mgm't Servs.*, 23 Cal. 4th 116 (2000).................................................................. 38

*Leyva v. Medline Indus.*, 716 F.3d 510 (9th Cir. 2013) ................................................................ 40

23

*Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440 (2005) .......................................................... 43

*Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012) .......................................... 40, 41

24

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008)................................................... 40, 41

*Nat'l Rural Telecomm. Co-op v. DirecTV, Inc.*, 319 F. Supp. 2d 1059 (C.D. Cal. 2003) ................. 25

25

*Nelson v. Pearson Ford Co.*, 186 Cal. App. 4th 983 (2010).......................................................... 25

*O'Gara ex rel. Estate of Portnick v. Countrywide Home Loans, Inc.*, 282 F.R.D. 81 (D. Del. 2012) 37

26

Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615 (9th Cir. 1982) ....................................... 45

*Ogden v. Bumble Bee Foods, LLC*, No. 12-CV-01828-LHK, 2014 WL 27527 (N.D. Cal. Jan. 2, 2014)

27

    .......................................................................................................................................... 22

*Olson v. Cohen*, 106 Cal. App. 4th 1209 (2003)....................................................................... 21, 23

28

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .................................................................... 36, 37

*People v. Sarpas,* 225 Cal. App. 4th 1539 (2014)....................................................................... 43, 45

*Pineda v. Bank of Am., N.A.*, 50 Cal. 4th 1389 (2010)................................................... 21, 24
*Preiser v. Newkirk*, 422 U.S. 395, 95 S. Ct. 2330, 45 L. Ed. 2d 272 (1975) ...................................... 46
*Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516 (C.D. Cal. 2011)........................................... 36
*Ries v. Ariz. Beverages USA LLC*, 10-01139 RS, 2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) 28, 46
*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) ...................................... 42
*SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176 (2012) ........................................ 25
*Spano v. Boeing Co.*, 633 F.3d 574 (7th Cir. 2011).................................................. 37
*Stuller v. Steak N Shake Enters., Inc.*, 877 F. Supp. 2d 674 (C.D. Ill. 2012)...................................... 27
*Taylor v. Sturgell*, 553 U.S. 880 (2008).......................................................... 37
*Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305 (2009) ........................................ 44, 45
*United States v. Hernandez*, 322 F.3d 592 (9th Cir. 2003)........................................... 26
*United States v. Ramirez*, 347 F.3d 792 (9th Cir. 2003) ............................................. 26
*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ........................................ 35
*Vinole v. Countrywide Home Loans*, 246 F.R.D. 637 (S.D. Cal. 2007) ..................................... 45
*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) .......................................... passim
*Zinser v. Accuflix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) ................................... 35

# I.     INTRODUCTION

The Court entered summary judgment in favor of Plaintiffs Gail Hahn, Chaille Duncan, and Alexis Hernandez on their claim that the membership agreements used by Massage Envy Franchising, LLC's ("MEF's") independently owned and operated California franchises are unlawful under Cal. Bus. & Prof. Code § 17200 (the "UCL") (Count One).  *See* Order [Dkt. 271] (the "MSJ Order").  MEF continues to disagree with a number of this Court's prior rulings, and MEF expressly preserves all of its appellate rights (and waives none) with respect to those decisions.[1]  Nonetheless, in light of this Court's prior rulings, the sole remaining issues for trial are "injunctive relief and the amount of restitution."  *See id.*, p. 31:20-21.  MEF therefore respectfully submits this Memorandum of Contentions of Fact and Law to address the following specific issues to be adjudicated during the trial:

(1)  the form of restitution to which Plaintiffs are entitled (*i.e.*, a monetary award or reinstatement);

(2)  the amount of any restitution that each of the ▆▆▆▆ Class Members is entitled to recover;

(3)  if Plaintiffs met their burden of proof on restitution, the amount of appropriate offsets;

(4)  any injunctive relief to which Plaintiffs may be entitled;

(5)  the consequences of Plaintiffs' failure to identify a workable trial plan for class restitution trial;

(6)  whether Plaintiffs' proposed "trial by formula" comports with Rule 23, the Rules Enabling Act, and due process; and

(7)  the decertification of the Class, following Plaintiffs' introduction of evidence.

---

[1] These disputed rulings include, but are not limited to, rulings on the parties' respective summary judgment motions [Dkt. 271], Plaintiffs' class certification motion [Dkt. 160], MEF's decertification motion [Dkt. 271], MEF's motion to exclude Plaintiffs' expert [Dkt. 271], and MEF's Motion to Dismiss [Dkt. 52].  *See infra* § II.

1    Plaintiffs have the burden to establish by substantial evidence the amount of

2   restitution (if any) to which they are entitled.  *See Colgan v. Leatherman Tool Grp.,*

3   *Inc.*, 135 Cal. App. 4th 663, 700 (2006).  Even though the Court has found a violation

4   of the UCL, the UCL does not mandate restitutionary relief, however.  *See Cortez v.*

5   *Purolator Air Filtration Prods., Inc.*, 23 Cal. 4th 163, 180 (2000).

6    As explained below, to the extent Plaintiffs are entitled to any restitution at all, it

7   is limited to a form that would "restore" the "property" they claim to have lost in

8   accordance with Business and Professions Code section 17203.  *See* Business &

9   Professions Code section 17203 (Court may enter such orders "as may be necessary to

10   *restore* to any person . . .") (emphasis added).  The only thing for which the Class

11   Members paid is membership—with access to one monthly 50-minute

12   massage/member service during the membership term being only one of the many

13   benefits of membership.  It is undisputed that Plaintiffs could not have traded in their

14   one free massage per month for cash.  Accordingly, at most, Plaintiffs' relief is limited

15   to reinstatement of their purported "lost" massages—not monetary restitution

16   equivalent to the value of their membership dues, as Plaintiffs argue, because this

17   would provide to Plaintiffs something different (i.e., money) than—and above and

18   beyond—what they lost (i.e., massages) and Defendant purportedly gained. Allowing

19   monetary "restitution" where plaintiffs did not lose money would amount to an award

20   of damages—which the UCL forbids.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29

21   Cal. 4th 1134, 1152 (2003).

22    If, however, this Court disagrees and concludes that Plaintiffs are entitled to

23   monetary restitution, then, as this Court found, "[t]he proper measure of restitution is

24   '[t]he difference between what the plaintiff paid and the value plaintiff received.'"

25   Dkt. 271 at 27.  Accordingly, before any amount of monetary restitution is appropriate,

26   Plaintiffs must prove, for each Class Member, the difference between what the

27   plaintiffs paid and the value of what they received.  *In re Facebook, Inc. v. PPC Adver.*

28   *Litig.*, 282 F.R.D. 446, 461 (N.D. Cal. April 13, 2012).  This Plaintiffs cannot do.

1    Plaintiffs do not intend to proffer *any* evidence as to the value of the benefits the Class

2    received from their membership; instead, Plaintiffs intend to rely upon a "fluid

3    recovery" model, which is nothing but a formula: $59 (the monthly membership rate) x

4    the number of purportedly "lost" monthly member massages.

5            Pursuant to their formula, Plaintiffs contend they are entitled to approximately

6    ███████. Plaintiffs' "fluid recovery" model is the equivalent of the "trial by

7    formula" that the Supreme Court squarely rejected in *Wal-Mart Stores, Inc. v. Dukes*,

8    131 S. Ct. 2541, 2551 (2011)*,* and it violates both Rule 23 and MEF's due process

9    right to defend itself against each individual Class Member's claims.  For these

10   reasons, the Ninth Circuit has expressly rejected a fluid recovery:  "[A]llowing gross

11   damages by treating unsubstantiated claims of class members collectively significantly

12   alters substantive rights under [the UCL].  Such enlargement or modification of

13   substantive statutory rights by procedural devices is clearly prohibited by the Enabling

14   Act that authorizes the Supreme Court to promulgate the Federal Rules of Civil

15   Procedure."  *In re Hotel Charges*, 500 F.3d 86, 90 (9th Cir. 1974).

16           Even if the Court were to adopt Plaintiffs' fluid recovery model and allow

17   Plaintiffs to prove restitution on an aggregate basis – which it should not do, as it

18   would be reversible error – Plaintiffs still cannot prevail.  In the aggregate, the Class

19   Members collectively benefited from their memberships in excess of ████ million

20   more than they paid in membership dues.[2]  For all of these reasons, Plaintiffs will not

21   be entitled to any restitution award (or reinstatement).

22           Plaintiffs also will not be entitled to any injunctive relief against MEF for the

23   reasons further discussed herein namely:  MEF's independently owned and operated

24   franchises are not parties here and Plaintiffs have not proved that MEF can cause any

25   _____

26   [2] This and certain other information redacted herein is filed under seal pursuant to the
     Court's orders granting MEF's requests to file confidential, proprietary business
27   information under seal.  *See* MEF's Motion to Seal (filed concurrently herewith);
     Local Rule 79.2, the Protective Order (Dkt. 57), Federal Rule of Civil Procedure 26(c),
28   and this Court's December 2, 2013, June 23, 2014, and August 1, 2014, Orders [Dkts.
     110, 188, and 234].

1  purported "forfeiture" to cease, or can provide any massage services if any member

2  services are ordered reinstated or cause any such massages to be provided.

3       Simply put, even if Plaintiffs had standing to pursue their claims, Plaintiffs

4  cannot meet their burden of proof and are not entitled to a restitution award of any

5  kind, much less a monetary restitution award in any amount.  Importantly, Plaintiffs'

6  lack of a workable trial plan and failure to present a restitution model, must less

7  evidence, sufficient to calculate any restitution on a class-wide basis will require

8  decertification of the Class following the introduction of evidence as also further

9  discussed herein.[3]

10  **II.   SUMMARY OF COURT'S PRIOR DECISIONS**

11       In July 2013, MEF sought dismissal of the First Amended Complaint ("FAC")

12  on grounds, among other things, that Hahn (the then-sole Plaintiff) lacked standing, the

13  independently owned and operated franchises were indispensable parties, and MEF

14  could not be liable for the terms of a membership agreement that Plaintiff entered with

15  MEF's independently owned and operated franchises.  *See* Dkt. 39.  The Court denied

16  the motion on September 17, 2013.  *See* Order [Dkt. 52].

17       A few months later, Hahn sought class certification and Hernandez and Duncan

18  sought to intervene.  *See* Dkts. 64 and 68.  The Court granted the unopposed motion to

19  intervene.  *See* Order [Dkt. 160].  MEF opposed class certification on the grounds that

20  individualized issues predominate and there is no common method to resolve

21  Plaintiffs' claims, among other things.  *See* Dkt. 81.  The Court certified the

22  Cancellation and Arrears Classes only with respect to Plaintiffs' claim under the

23  UCL's unlawful prong.  *See* Order [Dkt. 160].  The certified Class is defined as:

24  "California residents, from December 7, 2007 to the present, who were enrolled in a

25  Massage Envy Membership program, and who (a) forfeited prepaid massages because

26

27  _____
[3] MEF intends to separately move to decertify the Class and to find that Plaintiffs lack
standing to pursue their claims on the Class's behalf or otherwise.  As these issues will
28  be separately addressed, they are not addressed in detail herein but are nonetheless
expressly preserved.

they cancelled their Massage Envy membership; or (b) forfeited prepaid massages because they did not keep their membership current by making timely payments." *See id*. at 23:17-21.

Plaintiffs then filed a Motion for Summary Judgment, asking the Court to find MEF liable under the UCL and to enter judgment in their favor on all of MEF's affirmative defenses. *See* Dkt. 175. MEF opposed and filed a Cross-Motion seeking, in part, summary judgment (i) limiting Plaintiffs' recovery on their UCL to restitution and (ii) limiting the maximum amount of any restitution to the funds MEF actually received (from its franchisees) with respect to the membership agreements between franchisees and members of the Plaintiff Class and only to the extent Plaintiffs demonstrate that any such funds are attributable to any actual losses Plaintiffs (and the Class) may have suffered. *See* Dkt. 195. MEF also sought to decertify the Class and exclude Plaintiffs' financial expert, Thomas M. Neches, because Plaintiffs had not proffered a class-wide restitution model that properly accounts for the value of the benefits Class Members received from their membership and thus had not demonstrated that common issues predominate. *See* Dkt. 193. The Court (1) granted Plaintiffs' Motion for Summary Judgment with respect to MEF's "liability for unlawful business practices, Plaintiffs' entitlement to restitution, and all affirmative defenses except for offset"; (2) granted MEF's Motion for Summary Judgment "with respect to Plaintiffs' claims for treble damages and nonrestitutionary disgorgement"; and (3) denied MEF's motions to decertify and exclude Mr. Neches. *See* MSJ Order [Dkt. 271], p. 31. As the Court explained, the sole remaining issues for trial are "injunctive relief and the amount of restitution." *Id*.

MEF expressly preserves all of its appellate rights with respect to each of these rulings. MEF continues to disagree with the Court's various rulings on the parties' respective motions. These disputes include, among other things:

- the Court's denial of MEF's Motion to Dismiss under Rule 12(b)(1), 12(b)(6), and 12(b)(7) [Dkt. 52];

- the propriety of Certification of the Class and the requirements for certification under Rule 23 [Dkt. 160];

- the granting of Plaintiffs' motion for summary judgment on the questions of whether the membership agreements are unconscionable under the Unfair Competition Law and an unlawful penalty under Civil Code § 1671(d), whether MEF is liable for claims arising under the membership agreements that its independently owned and operated franchisees entered with the Class Members, whether MEF controlled its franchisees, and whether MEF may be liable to pay more in restitution than it received as a result of the alleged wrongful conduct [Dkt. 271]. Among other errors in this ruling, the Court improperly construed facts against MEF and resolved inferences in Plaintiffs' favor;

- the Court's denial of MEF's summary judgment motion on the issues of whether Cal. Civ. Code § 1442 is a basis for an unlawful UCL claim and whether the challenged provision is a liquidated damages clause (in addition to the parallel issues on which both MEF and Plaintiffs moved and the Court granted Plaintiffs' summary judgment motion, mentioned above) [Dkt. 271];

- the Court's denial of MEF's motion for decertification due to Plaintiffs' failure to present a class-wide restitution model [Dkt. 271]. In particular, in granting summary judgment for Plaintiffs on liability issues, the Court appears to have relied on the named Plaintiffs' individual circumstances and testimony, which illustrates why it was not proper to decide these issues on a class-wide basis;

- the Court's denial of MEF's motion to exclude Plaintiffs' expert on the basis that his report was untimely and that his testimony is inadmissible under Rule 702. [Dkt.271].

## III. OPERATIVE CONTENTIONS OF FACT

### A. The Massage Envy Franchise System

MEF is a franchisor headquartered in Scottsdale, Arizona, and does not own or operate a single Massage Envy location anywhere or employee any massage therapists or any other employees in the state of California. Declaration of Melanie Hansen [Dkt. 83], ¶¶ 12, 69. As the franchisor, MEF grants a license to independently owned and operated entities for use of the Massage Envy name, trademark, and standardized business operations in exchange for payment of a franchise fee and royalties. *Id.*

MEF does not execute any membership agreements and is not obligated to perform any actions or assume any responsibilities pursuant to any membership agreement with respect to providing massages or otherwise. *Id.* ¶ 65. Nor does MEF

administer, perform, or enforce the terms of any membership agreement or provide any member or customer with services such as massages or facials. *Id.* ¶¶ 11-12, 69-71.

Members do not pay member dues directly to MEF and MEF does not charge or collect membership dues from members. *Id.* ¶ 70. Instead, the independently owned and operated Massage Envy Spas (the "Spas") charge and collect member dues, process all EFTs, waive all EFTs, and issue all refunds. *Id.*

As the franchisor, MEF currently receives a 5% or 6% royalty (depending on the year in which a franchise agreement was entered) from each franchise's "Gross Sales" but retains only 2-3% of the royalty received from the California franchises, as 2-3% is designated for the California Regional Developers (pursuant to a separate contract with the regional developers). Franchise Disclosure Document ("FDD"), Item 6. Thus, at most, MEF retained 4% of any membership dues that Class Members paid to the independently owned and operated franchises related to expired member services (*i.e.*, massages) that the Class Members claim to have "lost." *See id.*

**B.    The Benefits Of Membership**

Services are offered by the Spas on an á la carte, pay-as-you-go basis (for example, currently, in some regions, a 50-minute massage costs $98) (MSJ Order, p. 3). Alternatively, customers have several membership options at varying costs and for varying lengths of time. Declaration of Melanie Hansen [Dkt. 83], ¶¶ 39-50. Plaintiffs and the Class all elected to take advantage of one of the membership options. Not all customers elect membership, however.

Customers who elect to join a Spa as a member receive a number of benefits in exchange for a monthly membership payment. These benefits include:

- a monthly 50-minute member service that can be used for a massage, foot scrub, or facial (the latter for an additional ▮▮▮); if the 50-minute monthly member service is not used in any given month, it rolls over and can be redeemed later as long as the membership remains current;
- substantially discounted prices for services and gift cards;

1       •       a ▮▮▮   discount for many retail products purchased;

2       •       a ▮▮▮   discount for service add-ons or upgrades such as a foot scrub, hot

3               stone treatment, and aromatherapy;

4       •       complimentary services and add-ons and upgrades;

5       •       membership referral upgrades;

6       •       the ability to use member benefits, including a 50-minute member service,

7               at any of the 900 franchised locations in the Massage Envy nationwide

8               reciprocity system;

9       •       reduced monthly dues for family members;

10      •       the ability to transfer or "gift" an unutilized 50-minute member service

11              that can be used for massages, foot scrubs, or facials;

12      •       for 12-month memberships, waiver of the ▮▮▮ enrollment fee;

13      •       the ability to "split" or combine monthly a 50-minute member service, for

14              example, they could at some spas opt to get a quick 30-minute massage

15              one month and in the next month enjoy an extended 80-minute treatment;

16              alternatively, a member could get both a facial and a massage on the same

17              visit;

18      •       the ability to bring guests in for a service at the ▮▮▮ introductory rate;

19      •       the opportunity to earn free massages and upgrades by referring new

20              members; and

21      •       the therapeutic benefits of regular massages.

22      Hansen Decl. [Dkt. 83] ¶¶ 44-45; Membership Brochure [Dkt. 83-24].

23              **C.      No Uniform Membership Pricing**

24              Class Members' monthly dues varied over the Class Period, ranging from ▮▮▮ to

25      ▮▮▮ per month, depending on the region and the type of membership selected.  For

26

27

28

example, in 2013, the Class Members paid the following varying monthly membership fees in the various California regions and markets:[4]

| PRICE POINTS IN DIFFERENT CALIFORNIA MARKETS | Introductory Massage Rate | Non–Member 1 hour Massage | Monthly Member Dues Rate | Additional Member Massage Rate | Valued Guest Rate |
|---|---|---|---|---|---|
| ███ | ■ | ■ | ■ | ■ | ■ |
| ███ | ■ | ■ | ■ | ■ | ■ |
| ███ | ■ | ■ | ■ | ■ | ■ |
| ███ | ■ | ■ | ■ | ■ | ■ |
| ███ | ■ | ■ | ■ | ■ | ■ |

Class Members paid dues monthly or in full in advance to their Home Clinic, *i.e.*, where they signed a Membership Agreement or subsequently transferred their membership.

**D.    No Uniform Membership Agreement**

Although MEF provided membership agreement templates to its California franchisees during the Class Period, these templates have varied and evolved.  For instance, none of these templates from 2007 to the present contain the word "prepaid

---

[4] The Class Members similarly had a varying number of membership services ex███ following membership conclusion.  For insta█████f the Class members of a:  (i) lo█t one (1) ████ership service (█ %); (ii) ████ lost ██wo (2) me████hip serv (█ %); (iii) ████ lost ██ree (3) m█ m█ █ ces (█ %); (iv) ████ lost f██r (4) m█mbership ██ ces (█ %);  (v) ████ lost five (5) ██embersh█ ices (█ %). Further, less than 1% (█ %), █ of t████ass lost 21 membership services, wh█ h is the number Hahn claims to ha██ ost.  Summary of the Number of Class Members and the Number of Unused Monthly Member Services from Millennium.

massages" and only two (2) of the three (3) named Plaintiffs' membership agreements contain the word "prepaid"; instead, each template uses the term "membership services" or "membership massages." *See* Exs G-T to Hansen Decl. [Dkt. 83]; Hahn Membership Agreement ("You may continue to redeem your pre-paid massages after the initial term of the membership as long as your membership has been renewed and is current."); Duncan Membership Agreement (same); Hernandez Membership Agreement ("Upon termination or cancellation of your membership, all unredeemed membership services will expire.").

Some California franchises also have modified and otherwise deviated from then-current membership agreement templates and made their own day-to-day decisions regarding offering memberships and the contents of membership agreements, among other things. *See* Exhibits to July 1, 2014, Declaration of Triss Goodwin [Dkt. 203] (illustrating modifications made *at the time the agreements were entered*).  Other franchisees in California made similar modifications to the template member agreements *at the time the agreements were entered*.); Exhibit to July 1, 2014, Verification of Roger Gutierrez (manager of Massage Envy franchise in Rancho Penasquitos, California) (Dkt. 204); *see also* Declaration of Melanie Hansen [Dkt. 83], ¶¶ 66-67; Declaration of Dennis Conklin [Dkt. 88], ¶¶ 12, 20; Declaration of Andrew Garsten [Dkt. 89], ¶ 19; Declaration of Triss Goodwin [Dkt. 90], ¶ 12; Declaration of Kirk Peacock [Dkt. 93], ¶¶ 12-13, 19-20.

In addition, some forms of the membership agreements that the independently owned and operated California franchises used provided that unutilized member benefits expired immediately upon cancellation or termination; other versions extended the time for redemption for thirty (30) more days and even up to six (6) months after cancellation to redeem any unused unredeemed membership services. *See, e.g.*, Exs. G-T to Hansen Decl. [Dkt. 83]; Goodwin Decl. [Dkt. 90] ¶ 33.  However, some Home Clinics allowed Class Members thirty (30) days after cancellation or termination to redeem unused monthly member services even though their membership agreement

1  stated that unused monthly member services immediately expired (as was true for both

2  Hernandez and Duncan).  *See, e.g.*, Goodwin Decl. [Dkt. 90] ¶ 30.

3  California franchises also made various accommodations to the Class Members

4  including, for example:  waiving and/or refunding EFT payments at the member's

5  request when the member was unable to use the unredeemed membership services;

6  reinstating previously unused membership services upon re-enrollment; providing the

7  value of the unused membership services through a gift card; and offering a $100 "buy

8  out."  MEF's Operations Manual expressly contemplates franchises granting case-by-

9  case variances, waivers, and other accommodations to members with respect to their

10 membership circumstances:  "Once a membership is cancelled, all unused membership

11 services expire *unless extended by management*."  Operations Manual, Membership

12 Offerings Policy.

13 **E.    Plaintiff Gail Hahn**

14 In September 2008, after receiving an "introductory" discount priced massage,

15 Hahn joined the independently owned and operated Santee Spa, electing a 12-month

16 membership to secure discounted service prices and waiver of the enrollment fee, in

17 exchange for which she promised to pay Santee Spa $59 monthly dues.  *See* Hahn

18 Membership Agreement.  Hahn had received massages from other providers prior to

19 becoming a member and understood that membership was not required because she

20 "could just walk in each week and pay for [a] massage . . . at a higher rate."  Ex. A

21 (Hahn Depo.) to Scott Decl. [Doc. 201] at 82:23-83:6.

22 Hahn intended to use all of her member benefits when she signed her

23 membership agreement and obtained two "excellent" massages and gifted one monthly

24 member service to a friend during her membership term.  *Id.* at 157:11-12, 65:16-17,

25 78:6-7, 112:13-25.  When her one-year contractual membership period expired in

26 October 2009, Hahn was free to discontinue her membership with Santee Spa.  But,

27 instead, she continued to timely pay monthly membership dues for nearly another year

28 until August 2010, when her husband discontinued EFT payments.

1    Approximately fifteen (15) months after her husband discontinued further EFT

2    payments and the day before she filed this lawsuit, on December 6, 2011, Hahn went

3    to the Santee Spa to schedule an appointment. *Id.* at 194:6-25.  The Santee Spa

4    advised that her membership had expired. *Id.* at 195:2-9.  Hahn never asked that any

5    expired monthly member services be reinstated (or refunded). *Id.* 193:14-19, 192:10-

6    14.  Indeed, Hahn claims she does not want reinstatement of expired services; she only

7    wants monetary restitution, albeit in an unknown amount. *Id.* at 371:6-12, 399:7-24.

8    Hahn testified that she does not want any expired member services reinstated because

9    she did not have time to use the member services available to her during her

10   membership term and, at least through the time of her deposition in November 2013,

11   she still did not have time for massages. *Id.* at 102:25-103:25.

12       **F.    Plaintiff Alexis Hernandez**

13       On October 2, 2011, after receiving a massage and a facial at a substantially

14   reduced "introductory" guest rate, Hernandez elected to enter a 13-month membership

15   agreement at the independently owned and operated Terra Nova Spa, agreeing to make

16   twelve (12) monthly payments of $59; her enrollment fee and one month's dues were

17   waived. *See* Hernandez Membership Agreement.

18       Two months later, Hernandez froze her membership, deferring monthly dues for

19   five (5) months.  Hernandez Freeze Request [Dkt. 158-18] at MEF-Hahn034929.

20   When she re-activated her membership in August 2012, she did not lose any

21   unredeemed monthly member services. Ex. B (Hernandez Depo.) to Scott Decl. [Doc.

22   201] at 139:21-140:7, 146:23-147:10, 170:19-171:3.  At that time, she advised Terra

23   Nova Spa that she would not be renewing her membership when it expired in March

24   2013 (*i.e.*, at the end of her 13-month membership term). *See* Hernandez Cancellation

25   Form.  She understood that she needed to use any unused monthly member services

26   before March 2013 or they would expire at the end of her membership term. *Id.* at

27   170:12-18; 178:12-179:15.  A Terra Nova Spa sales associate reminded Hernandez,

28   orally and in writing, that she would need to redeem unutilized member services before

1   her cancellation was effective or they would expire thirty (30) days after cancellation.

2   *See* Hernandez Cancellation Form; Hernandez Depo. at 118:6-24, 119:15-21, 175:10-

3   16, 179:5-24.  The Terra Nova Spa gave Hernandez thirty (30) days after cancellation

4   in which to redeem any unutilized member services even though her membership

5   agreement stated that the services expired immediately upon cancellation.

6         After her membership agreement was re-activated, Hernandez redeemed a

7   monthly member service for a massage and a facial and received a free aromatherapy

8   upgrade by virtue of her membership.  She also purchased a retail product (eye cream)

9   at a ▮ % discount.

10        Although Hernandez elected not to redeem the monthly member services made

11  available to her by virtue of her membership prior to 30 days after membership

12  cancellation was effective, she concedes that neither MEF nor Terra Nova Spa did

13  anything to prevent redemption and that the Terra Nova Spa reminded her on more

14  than one occasion orally and in writing when unutilized member services would

15  expire.  Hernandez Depo. at 173:2-174:5, 120:22-121:6.  She thinks she utilized five

16  (5) of the monthly member services made available to her for facials and massages and

17  gifted one to a friend, but did not utilize eight (8) of the member services because of

18  her own "time constraints."  Hernandez Decl. [Dkt. 73], ¶¶ 5-6.; Hernandez Depo. at

19  43:13-17; 167:4-23, 164:23-165:6; 163:25-164:9; 241:22-242:12.  She also chose not

20  to use the one free monthly member service she received when she signed a 13-month

21  membership agreement.

22        Hernandez notified the Terra Nova Spa that she was cancelling more than 30

23  days before her last EFT payment was due.  *See* Hernandez Cancellation Form.

24  Hernandez accordingly paid *exactly* the total amount of monthly dues provided in her

25  membership agreement, *i.e.*, 12 payments of $59.  Hernandez Depo. at 131:12-132:4.

26  She never requested that the Santee Spa reinstate the member services she claims to

27  have "lost" nor did she request that the Santee Spa give her additional time in which to

28  use any unredeemed member services before they expired.  Nonetheless, Hernandez

1   claims that if the expired member services were reinstated, she would now make the

2   time to use them. *Id.* 164:18-22.

3           **G.      Plaintiff Chaille Duncan**

4           In June 2009, Duncan received an introductory massage at the independently

5   owned and operated Solana Beach Spa, which she so enjoyed she decided to become a

6   member.  Financial considerations led her to freeze her membership (*i.e.*, stop paying

7   dues) for six (6) months until September 23, 2010.  After her membership was re-

8   activated, Duncan used three (3) monthly member services.

9           In January 2011, Duncan informed the Carmel Valley Spa she wanted to cancel

10  and was informed that she then had three (3) unredeemed monthly member services

11  that would expire if not used within 30 days following her final EFT payment (*i.e.*, by

12  March 23, 2011).  November 21, 2013, Declaration of Amanda Martinez ("Martinez

13  Decl.") [Dkt. 92] ¶¶ 29, 44-45.  In total, Duncan used thirteen (13) of the monthly

14  member services made available to her but did not use two (2) of the available monthly

15  member services before they expired.[5]

16          Like Hernandez, Duncan's membership agreement provided that unredeemed

17  monthly member services would expire upon cancellation, but the Carmel Valley Spa

18  extended the redemption period for her. *See* Duncan's Membership Agreement.  The

19  Carmel Valley Spa also offered to give her two (2) facials and one (1) massage to use

20  during the extended redemption period, as well as a $10 gift card for her use at any

21  time.  Duncan Depo. at 221:17-223:2, 308:25-309:14.

22          Duncan admits she could have gifted her unused services to family or a friend.

23  *Id*. at 235:14-16.  Nonetheless, Duncan chose not to redeem or gift any unused member

24  _____

25  [5] In her November 7, 2013, Declaration, Duncan states that she paid for at least 9
    months of membership but did not use 3 of the monthly member services available to
    her before they expired. *See* Dkt. 76-1, ¶¶ 5-6.  At her November 9, 2013, deposition,

26  however, Duncan stated that she paid membership dues for either 9 or 10 or 13 or 16
    months but does not know how many monthly member services she used or did not

27  use.  These numbers contrast with the information produced by the Carmel Valley Spa,
    which indicates that Duncan paid for 15 membership months and used 12 of the
    monthly member services available to her.  Duncan produced financial records

28  indicating she only paid for 9 membership months, however.

services before they expired and does not contend that MEF or the Carmel Valley Spa interfered with her use of these member benefits. *Id.* at 138:24-140:3, 63:6-10. The simple truth is that she just "wasn't using them." *Id.* at 31:1-5. While a member, Duncan redeemed thirteen (13) "enjoyable" monthly member services, took advantage of the franchise's nationwide reciprocity system by visiting three (3) different locations, and gifted a member service to a friend.

Shortly before Duncan intervened in this class action, she called the Carmel Valley Spa to see if she could use any member services that had previously expired. Martinez Decl. [Dkt. 92], ¶ 48. Although personnel at the Spa was willing to discuss with her reinstating the expired member services, she did not pursue the opportunity, instead opting to intervene. *Id.* She does not want reinstatement of expired services and "does not want massages" from "any branch." Duncan Depo. 86:10-87:12. Instead, she wants a refund for those expired member services she admits she chose not to use. *Id.* Duncan is unable to identify how many services for which she wants a refund, however. *Id.* at 116:1-4.

## H.    Class Member Benefits on Services Received and Retail and Service Discounts

Approximately ██% of all former members of California franchises during the Class Period utilized all of the monthly massages that were included in their membership (i.e., had no treatments expire unused at the end of their membership term). July 2, 2014, Declaration of Mathew Michuta [Dkt. 194-2], ¶ 6. Collectively, all former members of California franchises benefitted in excess of $██ million purely from taking advantage of the member services and not any of the many other membership benefits, including discounts on upgrades (*e.g.*, receiving a discount for add-on services such as a foot scrub, hot stone treatment, and aromatherapy) and retail discounts.[6] Indeed, Hahn said discounts on services was one of the primary reasons

---

[6] This figure does not include the additional benefits that the Class Members received from purchasing massages and facials beyond the one 50-minute member services received as part of their membership at steeply discounted membership rates.

1    she became a member.  Ex A (Hahn Depo.) to Scott Decl. [Dkt. 201] at 81:10-16;

2    158:4-10.

3            The discounts and membership benefits that the Class collectively received are

4    summarized below:

5            **Monthly Dues-Paying Class Member Savings on Monthly Membership**

6    **Services Used**.[7]  Dues-paying Class Members received savings on every service used

7    and purchased simply by being a member and being offered the member rate, instead

8    of the non-member higher, or rack, rate. (*See* MSJ Order, p. 3 (accepting $98 as non-

9    member market rate).)  Calculated at an aggregated $98 market rate (*Id.*), the total

10   savings to the monthly dues-paying Class Members for their one (1) monthly

11   membership services is $▮▮▮▮▮▮▮.  In other words, the dues-paying Class

12   Members would have paid at least this amount for the services the Class Members

13   used because they would not have received the discounted membership rate but instead

14   would have paid the market rate for each service.  *Id.* (accepting $98 as the market

15   rate); Part III.C *supra* (discussing the price points for each California market).

16          **EFT Waivers**.[8]  During the Class Period, franchisees waived EFT collectively

17   for the monthly dues-paying Class Members in the total amount of $▮▮▮▮▮▮.

18          **Retail Discounts**.  The Class Members collectively received a discount on

19   almost every retail product purchased, such as facial products.  Hernandez, for

20   example received a ▮% discount on an eye cream. *See* Results of Individualized

21   Millennium Query for Alexis Hernandez.  The collective total in discounts the dues-

22   paying Class Members received for retail items purchased is $▮▮▮▮▮.

23          **Gift Card Accommodations**.  Some Home Clinics gave Class Members gift

24   cards for at least part of the value of unused monthly member services to which the

25   Class Members had access but did not use as an accommodation at membership

26   conclusion.  The Class collectively received $▮▮▮▮▮▮ in gift card accommodations.

27

28   ───────────────────────
[7] These savings do not include the savings by the paid-in-full Class Members.
[8] These savings do not include the savings by the paid-in-full Class Members.

**Family Membership Discounts**.  Members have the ability to link their membership to others in their family and family members are given a $█ discount off the member's monthly membership dues.  *See* Operations Manual, Family Add-On Membership Policy.  There are █ Class Members that were charged the $█ dues rate, representing a family member discount.  These █ Class Members used █ services at a discount, collectively saving $█ on the family discount alone**.**

**Transfer of Membership Services**.  Members have the ability to transfer or gift their monthly membership services to another.  *See* Operations Manual, Transferring (Sharing) Membership Massages Policy.  Monthly dues-paying Class Members collectively transferred █ membership services to another.  These membership services are collectively valued at $█ (at a $59 membership rate).  Massage Envy franchised locations charged members $█ to transfer a membership service (though not all franchised locations do so or do so for each transfer).  *See* Operations Manual, Transferring (Sharing) Membership Massages Policy (MEF-Hahn030481-83).  If every Class Member who transferred a membership was charged the $10 transfer fee, the total transfer fee cost to the Class Members totals $█.  Accordingly, the collective total benefit the Class Members received by virtue of transferring a membership service is $█.

Collectively, the Class Members received more in value from their memberships than they paid.  For example, for those Class Members paying a $█ or $█ monthly membership fee, the Class Members broke even on their membership after they used approximately █% of their membership services (*i.e.*, if the Class Member used █ out of 12 monthly member services, the member has broken even on the membership).  Class Members paying a $█ monthly membership fee broke even on their membership after they used approximately █ of their membership services (or █ out of 12 monthly member services); Class Members paying a $█ monthly membership fee broke even on their membership after they used approximately █% of their membership services (or █ out of 12 monthly member services); and Class

MEF'S MEMO OF CONTENTIONS OF FACT AND LAW

Members paying a $███ monthly membership fee broke even on their membership after they used approximately ██% of their membership services (or █ out of 12 monthly member services).

I.      **Potential Windfall for Class Members Who Already Received More Than They Paid**

Some ████ Class Members (or more than ██%) had only one (1) unused member service expire as a result of membership conclusion. *See* Summary of the Number of Class Members and the Number of Unused Monthly Member Services from Millennium.  In addition, more than ████ of the Class Members (or almost █%) had five (5) or fewer unused member services expire as a result of membership conclusion. *See* Summary of the Number of Class Members and the Number of Unused Monthly Member Services from Millennium.   For the majority of the Class Members, including Hernandez and Duncan, they accordingly are not entitled to any restitution for the monthly member services that expired when they failed to use them prior to membership cancellation or termination. *See* MEF's Opposition to Plaintiff's Motion for Class Certification [Dkt. 97], pp. 8, 25.

For example, Duncan used 13 monthly member services and extracted value of at least $███ from her membership solely due to the difference between the discounted membership rates versus the $98 non-member rate.  If she is refunded the amount she is claimed due for the two (2) monthly member services she choose not to use during membership, she will have received value in excess of the amount of the membership fees she paid in the amount of at least $███.

Hernandez used eight (8) monthly member services and extracted value in at least the amount of $███ from her membership solely due to the difference between the discounted membership rates versus retail non-member rates.  Ex. B (Hernandez Depo.) to Scott Decl. [Doc. 201] at 43:13-17, 161:17-162:5.  If Hernandez is refunded what she claims is due her for the five (5) unused monthly member services she choose not to use before they expired, she will have received value in excess of the

membership fees she paid in the amount of at least $██.  Hernandez Decl. [Dkt. 73]

¶¶ 5-6.  These amounts do not even take into account any restitution that was offered

to each Plaintiff by her Home Clinic but which each declined or the value of other

membership benefits each received from her membership.  *See*, e.g., November 22,

2013, Declaration of Amanda Martinez [Dkt. 92], ¶ 48.  Accordingly, if Hernandez

and Duncan receive a monetary refund they will in essence receive a windfall. These

same individualized calculations must be done on a class-wide basis or on an aggregate

basis through Millennium.

### J.      Plaintiffs' Valuation of Their Member Benefits

Plaintiffs have not assigned any precise dollar value to any member benefit,

including even the redeemable monthly 50-minute member service.  *See generally*

Pls.' Mot. Summ. J. [Dkt. 175], pp. 25-26.  Instead, Plaintiffs presume that a full

refund of a month's dues is the proper value of a purported "forfeited" (*i.e.*, unutilized

and expired) 50-minute monthly member service and their cursory restitutionary

analysis ends there.  Pls.' Opp. to MEF's Mot. for Decert. [Dkt. 196], p. 6 n.2.

Plaintiffs' restitution calculation ignores that monthly dues paid to the independently

owned Spas varied and, thus, $59 (*i.e.*, the total membership dues each of the named

Plaintiffs paid monthly) cannot be presumed as the proper class-wide measure of the

value of one 50-minute member service (even if this was the only member benefit

received, which it unequivocally was not).  MEF's MSJ [Dkt. 244] at p. 27 n.15.

Plaintiffs' restitution calculation also ignores the value of the panoply of other member

benefits they received.  *Id.* at 26:11-29:7.

In addition, Plaintiffs did not directly pay any member dues (or any money) to

MEF.  November 22, 2013, Declaration of Melanie Hansen [Dkt. 83], ¶ 70.  The most

MEF received is either five (5) or six (6) percent (or 5 or 6 cents on each dollar) of the

"gross sales" that its independently owned and operated franchises collected from

Plaintiffs (and the Class).  FDD, Item 6 (MEF-Hahn001085-1088).  MEF in turn paid

2-3% of the royalty received from the California franchises to the California Regional Developers.

## IV.   ADDITIONAL PARTICULAR ITEMS PURSUANT TO LOCAL RULE 16.1(f)(3)(c):  CONTRACT CASE

This case is not a breach of contract case.  None of the parties claim any breach of any agreement and Plaintiffs do not have a damages claim.  *See generally* FAC; MEF's Answer [Dkt. 60]; MSJ Order.  Nonetheless, there are certain contract provisions that are relevant to the issues to be tried.

MEF will rely upon the provisions of its Franchise Agreements with its independently owned and operated franchises as set forth in Franchise Disclosure Documents registered with the state of California including the provisions related to the royalties paid to and retained by MEF with respect to membership dues paid by the Class Members to the franchises.  *See* Franchise Agreement Section 3.B [Royalty] (MEF-Hahn001164); 2013 FDD, Item 5 [Initial Fees] (MEF-Hahn001085).

MEF will also rely upon the Hahn Membership Agreement, the Hernandez Membership Agreement, the Duncan Membership Agreement, and the template membership agreements that MEF provided to its California franchises from 2007 to the present.

## V.   CONTENTIONS OF LAW

Plaintiffs have the burden to establish by substantial evidence the amount of restitution (if any) to which they are entitled.  *See Colgan*, 135 Cal. App. 4th at 700. As explained below, to the extent Plaintiffs are entitled to any restitution at all, it should be in a form that would "restore" the "property" they claim to have lost, in accordance with Business and Professions Code section 17203.  For that reason, they can get only equitable relief reinstating their purportedly "lost" massages—not monetary restitution.  If, however, this Court disagrees and awards Plaintiffs monetary restitution of their membership payments, then the law still requires the Court to determine appropriate offsets.  Contrary to Plaintiffs' arguments, this cannot be done

1    on a class-wide basis, in the aggregate, consistently with Rule 23 or MEF's due

2    process rights to defend itself against each individual claim.

3         **A.     Restitution: Legal Principles**

4         "[R]estitution is the only monetary remedy authorized in a private action

5    brought under the unfair competition law." *Clark v. Superior Court*, 50 Cal. 4th 605,

6    614 (2010).[9]  Business & Professions Code § 17203 provides that "[t]he court may

7    make such orders or judgments . . . as may be necessary to *restore* to any person in

8    interest any money or property, real or personal, which may have been acquired by

9    means of . . . unfair competition." (emphasis added).  The "fact that the 'restore' prong

10   of section 17203 is the only reference to monetary penalties . . . indicates that the

11   Legislature intended to limit the available monetary remedies under the act." *Korea*

12   *Supply Co.*, 29 Cal. 4th at 1148.  In other words, because "[a] UCL action is equitable

13   in nature; damages cannot be recovered." *Id.* at 1144.  Consistent with this limitation,

14   this Court has already found that Plaintiffs are entitled only to restitution and

15   injunctive relief.  *See* MSJ Order, p. 31.

16        But the UCL "does not mandate restitutionary . . . relief when an unfair business

17   practice has been shown." *Cortez*, 23 Cal. 4th at 180.  Rather, it provides that the court

18   "*may* make such orders or judgments." *Id.* (emphasis in original).  Courts thus possess

19   "broad equitable power" and "equitable considerations may . . . guide the court's

20   discretion in fashioning the equitable remedies authorized by section 17203." *Id.* at

21   179-80; *see also Olson v. Cohen*, 106 Cal. App. 4th 1209, 1215 (2003) (denying

22   restitution where recovery would have been "disproportionate to the wrong").

23        The "goal" of restitution under the UCL is to "restore plaintiff to the status quo

24   ante." *Pineda v. Bank of Am., N.A.*, 50 Cal. 4th 1389, 1401 (2010).  "Restitution

25   means the return of money or other property obtained through an improper means to

26   the person from whom the property was taken." *Clark*, 50 Cal. 4th at 614.  The UCL

27   _____

28   [9] By contrast, public law enforcement officials bringing a UCL action may recover
     penalties. *See, e.g.*, William L. Stern, Business & Professions Code § 17200 Practice
     ch. 9. F. (Rutter 2014) (emphasis added).

1   does not permit economical windfalls, such as "nonrestitutionary disgorgement."

2   *Korea Supply*, 29 Cal. 4th at 1152; *see also Akkerman v. Mecta Corp., Inc.*, 152 Cal.

3   App. 4th 1094, 1101 (2007) (finding that UCL does not permit a "windfall award of

4   restitution").

5         As this Court has found, "[t]he proper measure of restitution is '[t]he difference

6   between what the plaintiff paid and the value of what the plaintiff received.'"  MSJ

7   Order, p. 27 (quoting *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2009)).

8   Stated differently, restitution is "the excess of what the plaintiff gave the defendant

9   over the value of what the plaintiff received."  *Cortez*, 23 Cal. 4th at 174.

10         A calculation of restitution therefore requires "evidence of *the actual value* of

11   what the plaintiff received."  *In re Vioxx*, 180 Cal. App. 4th at 131 (emphasis added).

12   In the class context, this means that "plaintiffs must be able to prove, *for each class*

13   *member*, the difference between what the plaintiffs paid and the value of what the

14   plaintiffs received."  *In re Facebook, Inc.,* 282 F.R.D. at 461 (emphasis added); *see*

15   *also In re Google Ad Words Litig.*, No. 08-3369, 2012 WL 28068, at *15 (N.D. Cal.

16   Jan. 5, 2012) ("Since the purpose of restitution is to return class members to status quo,

17   the amount of restitution due must account for the benefits received . . . .").

18         Where "class members undeniably received some benefit," restitution cannot be

19   based on a full refund that does not take into account the value of the benefits

20   conferred onto each Class Member.  *Caldera v. J.M. Smucker Co.*, No. 12-4936-GHK,

21   2014 WL 1477400, at *4 (C.D. Cal. April 15, 2014).  "In reality, the true value of []

22   products to consumers likely varies depending on individual consumer's motivation

23   for purchasing the products at issue."  *Id.*  For example, subjective value such as "taste

24   and convenience . . . demonstrate[] that the products had some value to [the

25   consumer]."  *Ogden v. Bumble Bee Foods, LLC*, No. 12-CV-01828-LHK, 2014 WL

26   27527, at *13 (N.D. Cal. Jan. 2, 2014) ("[Plaintiffs] must present additional evidence

27   of the value of [Defendant's] products . . . in order to obtain restitution.").  Therefore,

28   in calculating the amount of restitution, Plaintiffs cannot "depend[] upon the

1    assumption that not a single consumer received a single benefit . . . from Defendant's

2    [product or service]." *In re Pom Wonderful*, No. ML-10-02199, 2014 WL 1225184, at

3    *3 n.2 (C.D. Cal. Mar. 25, 2014).[10]

4    **B.     This Court Should Use Its Broad Discretion to Deny Any Amount of
            Restitution**

5    
6    Each of Plaintiffs' monthly membership dues provided them with numerous

7    benefits above and beyond simply receiving a monthly 50-minute massage.  *See* Part

8    III.B, H.  There is no evidence that MEF acted in bad faith in drafting the membership

9    agreements at issue.  Further, there is no class-wide evidence that Class Members

10   wanted to use—or would have used—the massages they claim to have lost, even if

11   their right to do so remained in perpetuity.  And MEF did nothing to prevent any Class

12   Member from utilizing their member benefits (including receiving massages) while the

13   memberships were active.

14   In light of these equitable factors, the Court should exercise its discretion and

15   award Plaintiffs $0 in restitution.  *Olson*, 106 Cal. App. 4th at 1214; *see also Cortez*,

16   23 Cal. 4th at 180 ("[W]hat would otherwise be equitable defenses may be considered

17   by the court when the court exercises its discretion over which, if any, remedies

18   authorized by section 17203 should be awarded.").

19   **C.     Even if Plaintiffs Meet Their Burden, Any Restitution Should Be
            Limited to Restoring the Massage Services That Plaintiffs Claim to
            Have Lost**

20   
21   This case concerns Plaintiffs' alleged forfeiture of their right to receive one or

22   more massages that were part of the myriad of benefits of their Massage Envy

23   membership.  Plaintiffs refer to these services as "pre-paid massages."[11]  As pleaded in

---

24   [10] Plaintiffs should not recover any restitution because they have no ownership interest
     in the member services they claim to have lost.  (MEF MSJ [Dkt. 195], pp. 3, 26.)

25   However, the Court has rejected this argument.  (MSJ Order at 7, 25.)  MEF
     respectfully disagrees and intends to raise this issue on appeal.

26   [11] MEF objects to this term—especially as applied to the entire Class—as only two (2)
     of the three (3) Plaintiffs' membership agreements use this term and none of MEF's

27   template membership agreements use this term.  *Compare* Hahn and Duncan
     Membership Agreements *with* Hernandez Membership Agreement *and* Exhibits G-T to

28   the November 22, 2013, Declaration of Melanie Hansen [Dkt. 83].  As the Court has

1    the operative complaint, Plaintiffs seek an injunction "prohibiting Defendant's

2    forfeiture of massages" and "reinstatement of Plaintiff and the Class' paid massages."

3    FAC at p. 21.  Plaintiffs describe that their "underlying legal theory is Defendant's

4    unlawful forfeiture of prepaid massages . . . ."  Pls'. Opp. to MEF's Mot. for Decert.

5    [Dkt. No. 196], p. 11.

6         Yet, instead of seeking an order reinstating those alleged "forfeited" massages as

7    restitution, Plaintiffs now appear to seek monetary recovery of their monthly

8    membership dues.  This is an apples and oranges scenario.  It is undisputed that

9    Plaintiffs could not have traded in their one free massage per month for cash.  So

10   Plaintiffs cannot use this lawsuit as an end-run around that contractual limitation in

11   their member agreements.  The UCL does not authorize plaintiffs to receive something

12   "beyond that which [they were] promised."  *Baggett v. Hewlett-Packard Co.*, No.

13   SACV070667AGRNBX, 2009 WL 3178066, at *3 (C.D. Cal. Sept. 29, 2009).

14        On the contrary, to the extent this Court is correct that Class Members lost a

15   "property right" in the form of an "ownership interest in unused prepaid massage

16   services" MSJ Order p pp. 7, 25, which MEF vigorously disputes, then the UCL

17   authorizes this Court to "restore" that lost "property."  Bus. & Prof. Code § 17203.  In

18   other words, the Court should be focused on restoring the *status quo ante*.  *Pineda*, 50

19   Cal. 4th at 1401.  Giving Plaintiffs a monetary recovery would go far beyond restoring

20   the status quo; it would be awarding them something qualitatively different from what

21   they claim to have lost.

22        According to Plaintiffs, their restitution model is a matter of "simple

23   accounting," in which each Class Member would receive "the amount paid for each

24   unused prepaid massage, less any refunds issued that can be identified from

25   Defendants' Millennium database."  (Dkt. 196 at 11.)  But the fundamental flaw in this

26   theory is that no Class Member paid for an "unused prepaid massage."  Rather, the

27   _____

28   also used this term, by using this term herein, MEF is not adopting this term and
     expressly reserves its appellate rights to contest the use of this term.  (MSJ Order, p.
     7.)  Nonetheless, for ease of reference herein, it uses this term herein.

1    entire Class paid for a monthly *membership* of which one monthly 50-minute massage

2    was only one of the various benefits (in addition to discounts on products and services,

3    etc.).  *See* Part III.B, H.  Merely ordering that a Class Member's monthly membership

4    payment be returned to him or her in full is the equivalent to "non-restitutionary

5    disgorgement," which is plainly not allowed.  *See*, *e.g., Korea Supply Co.*, 29 Cal. 4th

6    at 1152 ("We hold that nonrestitutionary disgorgement of profits is not an available

7    remedy in an individual action under the UCL.").

8           Moreover, if Plaintiffs were allowed to recover a monetary award to compensate

9    for their "lost" "prepaid" massages, instead of in-kind restoration of those massages, it

10   would amount to an award of damages—which also is not permitted under the UCL.

11   *See Korea Supply*, 29 Cal. 4th at 1144; *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp.

12   2d 1176, 1186-87 (2012) ("To allow Histogen to recover for these contingent values

13   would be to allow the UCL to function as 'an all-purpose substitute for a tort or

14   contract action, something the legislature never intended.'").  "At bottom, Plaintiffs are

15   essentially seeking damages, not the return of money in which they have an

16   identifiable property interest."  *Nat'l Rural Telecomm. Co-op v. DirecTV, Inc.*, 319 F.

17   Supp. 2d 1059, 1081 (C.D. Cal. 2003).  The Court should reject Plaintiffs' invitation to

18   use the UCL as a means of obtaining disguised damages.  *See*, *e.g., Baugh v. CBS, Inc.*,

19   828 F. Supp. 745, 758 (N.D. Cal. 1993) ("Under Plaintiffs' approach, any damage

20   claim could be converted into an argument for restitution.  [Section] 17203 plainly did

21   not intend such a result.").[12]

22          Further, reinstatement of Plaintiffs' "lost" "prepaid massages" is the only form

23   of relief that could protect MEF's due process in this class proceeding and it is the only

24

25   ───────────────

     [12] Monetary restitution would also be the functional equivalent of rescission of the
26   membership agreement—at least for the months during which Plaintiffs' memberships
     were active but they elected not to use their one member massage for that month.  But
     there is "no authority supporting the remedy of rescission in a UCL action."  *Nelson v.*
27   *Pearson Ford Co.*, 186 Cal. App. 4th 983, 1018 (2010) ("[T]o the extent [that] the trial
     court used the UCL as a basis to support its order[ing] giving the insurance class
28   members the option to retain their vehicle, or rescind their contracts and return their
     vehicles, the judgment is reversed.").

class-wide method of awarding relief consistent with Plaintiffs' theory of liability. *See Comcast v. Behrend*, 133 S. Ct. 1426, 1342 (2013) ("[A]t trial . . . any model supporting a plaintiff's damages case must be consistent with its liability case . . . ." (internal marks and citation omitted)). And as discussed below (*infra* at Part V.D), reinstatement of the Class Members' forfeited massages is the only way to avoid the litany of individualized issues that arise in trying to place a monetary value on "[t]he difference between what the plaintiff paid and the value of what the plaintiff received." *In re Vioxx*, 180 Cal. App. 4th at 131. The Court should therefore construe section 17203 to permit only "restor[ation]" of Plaintiffs' massages and nothing more. *See, e.g.*, *United States v. Ramirez*, 347 F.3d 792, 802 (9th Cir. 2003) ("'[c]ourts can and should . . . adopt statutory interpretations, when feasible, that will avoid serious constitutional issues'") (quoting *United States v. Hernandez*, 322 F.3d 592, 602 (9th Cir. 2003)).

In sum, the only award of restitutionary relief that makes sense here, is equitable, and that is authorized by the UCL is an order directing MEF to "restore" the massages that Plaintiffs claim they lost (*i.e.*, reinstatement of the massages).

### D. Even if Plaintiffs Could Meet Their Reinstatement Burden, Plaintiffs Have Not Demonstrated That MEF Can Be Ordered to Reinstate Member Services

Plaintiffs have sued the wrong party by not suing the franchises who are the only entities that provide massage and facial services, and the only entities with whom the plaintiffs contracted. *See* MEF's Motion to Dismiss [Dkt. 39], pp. 10-13 (and case law cited therein). The independently owned and operated franchises are the entities that provide the massages (and facials) to the Class Members; MEF has no employees in any state, including in California, who could render any such services. Plaintiffs have not proven that MEF sufficiently controls its franchisees or that it can otherwise require them to provide any reinstated services to the Class Members. Nor have Plaintiffs proven that MEF can order or require its independently owned and operated franchisees to reinstate a single expired service or that doing so would not risk MEF

breaching its agreements with its California franchisees.  *See*, *e.g.*, Franchise Agreement, FDD, § 8; *Stuller v. Steak N Shake Enters., Inc.*, 877 F. Supp. 2d 674 (C.D. Ill. 2012) (franchisor authority to mandate franchisee business practices limited by franchise agreement); *Bird Hotel Corp. v. Super 8 Motels, Inc.*, CIV 06-4073, 2010 WL 572741 (D. S.D. Feb. 16, 2010) (same).

### E.     If Monetary Restitution Is Allowed, It Must Be Limited to the Difference Between What Plaintiffs Paid And the Value of What Plaintiffs Received

As discussed above, *see supra* in Part III. J and V.A, before Plaintiffs are entitled to any monetary restitution they must establish both the amount they paid and the value of the benefits they received from their membership. *See, e.g., In re Facebook, Inc.,* 282 F.R.D. at 461 ("Plaintiffs must be able to prove, for each class member, the difference between what the plaintiffs paid and the value of what the plaintiffs received.") (emphasis added).  This is *not* the same thing as the monthly membership fee because membership included benefits beyond the one monthly 50-minute massage.  Even if Plaintiffs could use the amount of their monthly membership dues as a rough proxy for how much they valued the one monthly 50-minute massage, Plaintiffs cannot establish the value of what they received from their memberships. Indeed, Plaintiffs do not intend to offer *any* evidence of the value of benefits received from their membership as they wrongly believe such evidence is irrelevant.  May 2, 2014, Neches Report at 9 ("In conclusion, any 'benefit' of Massage Envy's $59 monthly membership is irrelevant to the calculation of plaintiffs' restitution."). Plaintiffs thus cannot establish that the Class is entitled to any amount of restitution, much less the amount of restitution to which each Class Member is entitled.  Even if they could meet their burden, the evidence will be that the Class Members are not entitled to any restitution.

### 1.    Plaintiffs Cannot Meet Their Burden of Proving Restitution By Pointing in The Aggregate to Monthly Membership Dues Paid

If Plaintiffs meet their burden and prove that they are entitled to a monetary award rather than reinstatement, Plaintiffs similarly bear the burden of establishing, by substantial evidence, the amount of any restitution to which each of the ████ Class Members is entitled. *Ries v. Ariz. Beverages USA LLC*, 10-01139 RS, 2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) ("[P]laintiffs have not introduced any evidence to support the amount of restitution to which they may be entitled."). Plaintiffs cannot meet this burden by merely relying upon their calculation of their monthly dues payments and the monthly member services that each choose not to use before expiration.

### 2.    Plaintiffs' Restitution Analysis Improperly Fails to Account for the Varying Membership Dues Paid by Class Members

Contrary to their entire case theory, Plaintiffs seek to recover, as restitution, the total monthly dues each paid (*i.e.*, $59) associated with each month of unutilized 50-minute member service benefits (*i.e.*, $59 x the number of expired unutilized monthly member services). FAC ¶¶ 45, 50.[13] As an initial matter, Plaintiffs cannot calculate restitution by using the $59 monthly membership rate as not all Class Members paid a $59 monthly membership rate; instead, Class Members paid varying monthly membership rates of $████████████.

Plaintiffs have no evidence of which Class Members paid or even the number of Class Members who paid a monthly membership rate of $██, those who paid a monthly membership rate of $██, those who paid a monthly membership rate of $██, those who paid a monthly membership rate of $54, those who paid a monthly membership rate of $██, or those who paid a monthly membership rate of $██.

---

[13] Plaintiffs ignore entirely those ████ Class Members who paid in full for their membership (rather than paying m████y) and how to calculate any restitution to which such Class Members may be entitled. A██o, the ██ount of each Class Member's monthly dues payment varied between ██ and ██ during the Class period, a fact Plaintiffs also ignore. These are but a f██ exam██s of Plaintiffs' failure to account for the individualized inquiries that are required. The degree and extent to which each Plaintiff utilized member benefits during membership was exclusively within his or her control. These individualized inquiries further support decertification.

1    The expert report by Plaintiffs' retained expert, Thomas Neches, highlights this

2    fact.  Mr. Neches' erroneously adopts Plaintiffs' flawed analysis - that a monthly

3    membership fee equals the value of a 50-minute monthly member service -  and thus

4    fails to even consider or inquire about other member benefits that Plaintiffs (and the

5    Class) received as such information, in his words, is "irrelevant."  May 2, 2014,

6    Neches Report at 9.  Mr. Neches also fails to consider whether Class Members paid

7    monthly member dues in an amount other than $59.  *Id.* at 2.  Instead, he uses $59 "as

8    the average" of the monthly membership dues paid by the Class Members and does not

9    consider, much less, identify the differing monthly membership dues that each

10   individual Class Member paid.[14]  *Id.* ("The value of a lost monthly massage is the

11   amount plaintiffs actually paid, which 'averaged' approximately $59.").  As such,

12   Plaintiffs cannot meet their burden of proof even if their restitution calculation were

13   appropriate (which it is not).  For this reason, Plaintiffs also cannot prove that the value

14   of any "lost" massages exceeds the value of the membership benefits received by the

15   Class Members.

16              **3.     Plaintiffs' Restitution Analysis Improperly Fails to Account for
                        the Value of the Member Benefits They Received**
17

18          As discussed above, access to a monthly 50-minute member service was only

19   one of many member benefits received in exchange for member dues.  Yet, Plaintiffs'

20   restitution model assumes that the *sole* member benefit was access to one monthly 50-

21   minute massage and that none of the other member benefits are of any consequence

22   (even those Plaintiffs admit they utilized and enjoyed). It is facially implausible that no

23   Class Member received any value in exchange for their monthly dues beyond the

24   access to one redeemable monthly member massage.  *See In re POM Wonderful LLC*,

25   2014 WL 1225184 at *3.

26

27   ---
     [14] Mr. Neches also did no calculation of Plaintiffs' restitution because he claimed he
     had no data from the Millennium database (despite the fact the entirety of the
28   Millennium database had been produced to Plaintiffs).  *See* April 11, 2014 Neches
     Report at 3; Order Denying Plaintiffs' Motion to Compel and for Sanctions [Dkt. 224].

The benefits Plaintiffs and the Class enjoyed *because of their member status* and which must be valued as part of their restitution analysis as to each Class Member include the following:

**Service Discounts**.  Class Members received discounts on **every** service they received as compared to the market "rack" rate (*i.e.*, members received discounted pricing between $███ and $███ from the $98 non-member "rack" rate).  This includes a discount on both the 50-minute free monthly massage and additional massage and facial services purchased.  As discussed in Part III.H *supra*, the total value of savings the monthly dues-paying Class Members received for the monthly massages they used and the additional services purchased at the member rate is at least $███████ and the total value of savings the monthly dues-paying Class Members received on services they utilized even after subtracting the amounts the Class Members paid in monthly membership fees for the purportedly "lost" massages is at least $███████ – meaning the Class as a whole benefitted from their membership agreements just from the monthly member massage even after assessing any cost associated with unused treatments.  Calculating this benefit for the Paid-in-Full Class Members would only increase this total value received.

Thus, even if it were true that the only benefit Plaintiffs (and the Class) received was access to one redeemable monthly 50-minute massage (which it is not), it is undisputed that the Class Members received these services at a discount price *because of their member status*.[15]  That alone is a benefit that Plaintiffs cannot ignore in their restitution calculation.  The Class Members also received a steep discount on additional services they received beyond the one redeemable monthly 50-minute massage.

---

[15] In total, the Clas███████bers r███emed at least ███████ monthly 50-minute member services, which is ███████ (or ███) more than th███████ monthly services the Class Members collectiv███ ed to ███ eem.

**Complimentary Services**. Members are entitled to numerous complimentary services. Some Class Members, like Hernandez and Duncan, receive complimentary services when they enrolled in a 12-month membership.[16] *See* Operations Manual, Membership Offerings Policy. Other Class Members received complimentary service upgrades. For example, although members are typically charged $■ for an aromatherapy upgrade (rather than the $15 market rate), some Class Members, like Hernandez, received a complimentary aromatherapy upgrade (*i.e.*, for no charge) as a gift and gesture of goodwill from their Home Clinic. *See* Results of Individualized Millennium Query for Alexis Hernandez.

**Retail Discounts**. Members received discounts on almost every product purchased, without limitation to the number of products purchased. *See* Operations Manual, Membership Offerings Policy. This included a ■% discount on the purchase of Murad kits (facial products). *Id.* For example, Hernandez received a ■% discount on eye cream. *See* Results of Individualized Millennium Query for Alexis Hernandez. The Class Members collectively received a discount on retail items purchased from the Massage Envy franchises in the amount of $■■■■.

**Gift Card Purchase Discounts**. Members also received a discount on gift card purchases; thereby enabling a member to gift a massage or facial at a significantly reduced rate (as compared to the market and membership rate).

**Family Membership Discounts**. Members also received discounts for their family members. The Class Members collectively received a savings for family membership discounts in the amount of $■■■■.

**Guest Services Discounts**. Members were permitted to bring and/or refer guests for massage or facial services at the discounted rate of $■ for a 50-minute massage. *See* Operations Manual, Pricing Policy.

---

[16] Class Members who opted for a month-to-month, three (3) month, or six (6) month membership typically did not receive a complimentary monthly massage, however. *See* Operations Manual, Membership Offerings Policy. This further exemplifies the individualized inquiries that support decertification.

**Waiver of the Enrollment/Initiation Fee**.  Home Clinics have the discretion to waive the $█ enrollment/initiation fee for all Members who opt to execute a 12-month membership agreement.  *See* Operations Manual, Membership Offerings Policy.  Each of the Plaintiffs opted to execute a membership agreement for a 12-month term (when they could have executed a membership agreement for a 3-month or 6-month term or no membership agreement at all).  When they made this election, their $█ enrollment/initiation fee was waived.  This is not necessarily true for those Class Members who executed a membership agreement for less than 12-months.[17]

**Transferred Membership Services**.  Monthly dues-paying Class Members collectively transferred █ membership services to another individual.  A conservative value of the transferred membership services is $█.  Yet, Plaintiffs do not attempt to include this benefit received by some Class Members (but not others) in their restitution calculation.

**Membership Referral Upgrades**.  Members receive a complimentary half-hour upgrade to their membership services for each referred member enrollment.  *See* Operations Manual, Member Referral Program Policy.  This upgrade is valued at $█ (in a $98 market) for each referral.  *See id.*; Part III.C *supra* (discussing price points).  This benefit also needs to be included in Plaintiffs' restitution calculation.

**Access to the nationwide reciprocity system**.  Members may use their membership services and receive membership discounts and other membership benefits at any one of the more than 900 Massage Envy franchised locations nationwide.  Thus, location, distance, time, or travel does not preclude a Member from enjoying membership benefits.  For example, a Member who travels significantly for work or is on vacation away from home may redeem the free monthly massages or use other membership services at a location convenient to them.  Indeed, Duncan used this benefit by visiting three (3) different Massage Envy franchised locations during her membership term.  *See* Carmel Valley Client Buying History for Duncan.

---

[17] This is yet another individualized inquiry that supports decertification.

**Accommodations, EFT Waivers, Variances, and Catch-up Plans**.  Home Clinics have discretion and frequently exercised that discretion to extend the timeframe in which a member may use his or her monthly massage and to grant other accommodations or variances to members.  These accommodations include the following:

- Waiving EFTs for Class Members to allow members to use their membership benefit, including any accumulated massages, without being charged for a monthly membership fee.  The monthly dues-paying Class Members collectively have had EFTs waived by their Home Clinics in the total amount of $███████.

- Instituting a Catch-Up Plan ("CUP") or similar program pursuant to which Class Members "have a specified number of future dues payments waived in order to provide a period of time in which the member can catch up on using their existing membership credits for services.

- Issuing gift cards to Class Members for some or all unused monthly massages as an accommodation.  The Class Members collectively received $███████ in gift card accommodations.

- Allowing Members to transfer or "gift" unused monthly massages to others.

Each of these benefits, and others, are all benefits that the Class Members individually received from their membership.  Indeed, collectively, the Class Members received at least $██ million more in value from their memberships than they paid.  Yet, Plaintiffs do not intend to offer *any evidence* on these issues, much less the required "substantial evidence" concerning the value of the member benefits Plaintiffs received.  Plaintiffs' failure to proffer any such evidence is fatal to their ability to recover any restitution and fulfill their burdens at trial and will require entry of judgment in MEF's favor and/or decertification (as discussed further below).  *See*, *e.g.,*

*In re POM Wonderful LLC*, 2014 WL 1225184 at *3; *Caldera*, 2014 WL 1477400 at *4.

### F.   It is Not Possible to Adjudicate Monetary Restitution on a Class-Wide Basis Here Consistent With Rule 23 and Due Process

As explained above, to calculate the appropriate amount of restitution for an individual Class Member consistently with section 17203 and relevant case law—without embracing "nonrestitutionary disgorgement"—there are a myriad individualized calculations that must be made regarding the particular benefits that the hypothetical Class Member received from her membership.  Plaintiffs have proposed no workable trial plan for doing this on an aggregate basis.  Indeed, Plaintiffs' proposal for "fluid recovery" flies in the face of established precedent.  It is the equivalent of the "trial by formula" that the Supreme Court squarely rejected in *Dukes*, 131 S. Ct. at 2551, and it violates both Rule 23 and MEF's due process right to defend itself against each individual Class Members' claims.

### 1.   Plaintiffs Must Propose a Workable Trial Plan

In light of all the individualized issues inherent in calculating the amount of restitution due to each Class Member here, Plaintiffs must submit a proposal showing how it is possible to maintain a class-wide trial on that key question.  The "trial plan" is a critical part of the Rule 23 analysis, guiding both litigants and courts in answering the core question of how the case will be tried on a class-wide basis.  Absent such a plan, there can be no trial, let alone an aggregate award of monetary restitution as Plaintiffs seek.

As amended in 2003, Rule 23(c)(1)(B) provides that "[a]n order that certifies a class action *must* define the class and the class claims, issues, or defenses . . . ."  Fed. R. Civ. P. 23(c)(1)(B) (emphasis added).  Inherent in that requirement is consideration of *how* a trial on those "claims, issues, or defenses" would be conducted, including an advance determination that a collective adjudication will not abrogate substantive or procedural rights of any party.  Indeed, Rule 23(c)(1)(B) was added to reflect and

adopt the practice of "[a]n increasing number of courts requir[ing] a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof."  Fed. R. Civ. P. 23 Advisory Committee's note (2003).

The proponent of certification—here, Plaintiffs—bears the burden of supporting a certification order through trial, just as it bears the burden of proving any of the other requirements of Rule 23.  *See Dukes*, 131 S. Ct. at 2551 ("Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule."); *see also* Fed. R. Civ. P. 23(b)(3)(D). Courts have held that a district court abuses its discretion by deferring the analysis of whether a manageable trial plan exists until after certification.  *See Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 202 (3d Cir. 2009).  Indeed, requiring Plaintiffs to present a trial plan at the time of certification—or at the very least, as here, before the trial itself—allows the Court to test whether the class certification order complies with Rule 23(c)(1)(B) through the adversary process.  It is also the only way that a district court—and, ultimately, a reviewing court—can assure itself that the "claims, issues, and defenses" in the case can proceed to judgment after a manageable class trial.  *See Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1, 34 (2014) ("In rigidly adhering to its flawed trial plan and excluding relevant evidence central to the defense, the court here did not manage individual issues.  It ignored them.").

In light of these realities, requiring a "specific plan for litigating the case" is "a reasonable request."  *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013); *see also Zinser v. Accuflix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) (plaintiff "bears the burden of demonstrating a suitable and realistic plan for trial of the class claims" (quotation marks omitted)); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (reversing certification order where "[t]here has been no showing by Plaintiffs of how the class trial could be conducted"); *Badella v. Deniro Mktg. LLC*, 2011 U.S. Dist. LEXIS 128145, at *37-38 (N.D. Cal. Nov. 4, 2011) ("The

1  plaintiffs lack of any suggestions, much less a plan, as to how the Court should manage

2  this large proposed nationwide class action is troubling.") (Breyer, J.).[18]

3        Any proposed trial plan must provide sufficient detail for the court to determine

4  precisely what plaintiffs must prove in order to determine their entitlement to

5  restitutionary relief in any particular amount, "and then assess whether this proof can

6  be made within the parameters of Rule 23." *Hohider*, 574 F.3d at 197. The court must

7  also review what defenses are likely to be asserted and determine, again, whether they

8  can be resolved within the constraints of a class action. *Dukes*, 131 S. Ct. at 2561; *see*

9  *also Duran*, 59 Cal. 4th at 34 ("[O]ur precedents make clear that a class action trial

10  management plan may not foreclose the litigation of relevant affirmative defenses,

11  even when these defenses turn on individual questions."). At least one court has aptly

12  used the term "roadmap" to describe a trial plan. *See In re Methyl Tertiary Butyl Ether*

13  *("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 334 (S.D.N.Y. 2002).

14        The necessity of a trial plan is not a mere *pro forma* exercise. The Supreme

15  Court has repeatedly emphasized that a class action is not an exception to the

16  fundamental principle, rooted in due process, that everyone is due his or her own day

17  in court. *See Dukes*, 131 S. Ct. at 2550; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846

18  (1999). In light of these important concerns—including the preclusive effect of a class

19  action on absent Class Members' claims—class actions are permitted only in

20  accordance with the rigorous and detailed procedures established in Rule 23. *See*, *e.g.*,

21

22

---

23  [18] The Ninth Circuit has not had occasion to address the contours of the trial plan
requirement since Rule 23 was amended in 2003. Thus, while dictum in one Ninth
Circuit case says that "[n]othing in the Advisory Committee Notes suggests grafting a
24  requirement for a trial plan onto the rule" (*Chamberlan v. Ford Motor Co.*, 402 F.3d
952, 961 n.4 (9th Cir. 2005)), that misses the point. Rule 23 requires district courts to
25  address how the "claims, issues, and defenses" can be tried to a collective judgment.
In a complex case such as this one, the Court cannot discharge its mandatory
26  obligations under Rule 23(c)(1)(B) without the parties' input on how the trial could
and should be conducted. *See, e.g., Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516,
27  537 (C.D. Cal. 2011) (while trial plan not required, without one, "the court cannot
envision how it would conduct hundreds of individual inquiries to determine whether
28  an employee's recorded time was less than the actual hours that [the] employee
worked").

1    *Dukes*, 131 S. Ct. at 2550; *see also Taylor v. Sturgell*, 553 U.S. 880, 904 (2008); *Spano*

2    *v. Boeing Co.*, 633 F.3d 574, 584 (7th Cir. 2011).

3            The decision in *Comcast Corp.*—which requires the proponent of a Rule

4    23(b)(3) class to actually establish that she has a viable plan to calculate damages for

5    each class member consistent with the theory of class-wide liability—underscores the

6    necessity of a detailed trial plan here.  133 S. Ct. 1426, *see also, e.g., O'Gara ex rel.*

7    *Estate of Portnick v. Countrywide Home Loans, Inc.*, 282 F.R.D. 81, 92 and n.20 (D.

8    Del. 2012) (finding no superiority where plaintiff "failed to propose a trial plan

9    demonstrating that it would [be] possible or practicable to try this case as a class action

10   given the many individualized issues present"); *Haley v. Medtronic, Inc.*, 169 F.R.D.

11   643, 651-52 (C.D. Cal. 1996).

12           Beyond helping to ensure compliance with Rule 23 itself, a trial plan is an

13   indispensable tool to assist the Court in evaluating, as it must, whether class-wide

14   adjudication of restitution would abide by "the [Rules Enabling] Act's mandate that

15   [use of Rule 23] 'shall not abridge, enlarge or modify any substantive right.'"  *Ortiz*,

16   527 U.S. at 845 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997),

17   and 28 U.S.C. § 2072(b)).  Courts must ensure that a class action could be tried to

18   verdict consistent with both Rule 23 and the Constitution.  *Dukes*, 131 S. Ct. at 2551-

19   52 and n.6.  Without a thorough and nuanced understanding of the order and procedure

20   through which each aspect of the Class's restitution claims would be pressed and

21   defended against, for example, the Court cannot determine whether the proposed class

22   action may be tried to judgment without interfering with rights of each party under the

23   Due Process Clause.  *See*, *e.g., Ortiz*, 527 U.S. at 848 ("due process require[s] that

24   [absent class] member[s] 'receive notice plus an opportunity to be heard and

25   participate in the litigation'").

26           **2.    Plaintiffs' "Fluid Recovery" Model Is Inapposite Here, and
             Violates Rule 23 and Due Process**

27

28

Plaintiffs came closest to identifying their trial plan in opposing decertification. There, they acknowledged that a class-wide restitution analysis would ordinarily create individualized issues that would engulf any common ones.  But, they claim, they need not "prove restitution down to the individual class member."  Pls'. Opp. to MEF's Mot. for Decert. [Dkt. 196] p. 9.)  Plaintiffs are mistaken.

Plaintiffs expressly rely on a "fluid recovery" model under which this Court would avoid individualized inquiries by taking the "face value" of the aggregate number of "lost" massages at issue, and award it to the Class, with a subsequent claims process.  (*Id.* p. 10.)  "The theory underlying fluid class recovery is that since each class member cannot be compensated exactly for the damage he or she suffered, the best alternative is to pay damages in a way that benefits as many of the class members as possible and in the approximate proportion that each member has been damaged, even though, most probably, some injured class members will receive no compensation and some people not in the class will benefit from the distribution[.]"  *Bruno v. Superior Court*, 127 Cal. App. 3d 120, 123-24 (1981).  Plaintiffs' fluid recovery model is flawed on a number of levels.

**Fluid Recovery Is Not a Means of Determining the Appropriate Amount of Restitution**.  As an initial matter, "[f]luid recovery is a means of paying out damages, not of determining what a damage award should be."  *In re Pom Wonderful LLC*, 2014 WL 1225184 at n.4 (citing *Kraus v. Trinity Mgm't Servs.*, 23 Cal. 4th 116, 127 (2000)).  Therefore, Plaintiffs' reliance on a fluid recovery as a shortcut to establish the amount of class-wide restitution fails at the outset.

**Fluid Recovery Premised on a UCL Violation Does Not Entitle Plaintiffs to Non-Restitutionary Disgorgement.**  In any event, "even in class actions, fluid recovery cannot be used as a means to obtain nonrestitutionary disgorgement."  *In re Pom Wonderful LLC*, 2014 WL 1225184 at n.4.  Plaintiffs' proposed trial plan would grant them the equivalent of non-restitutionary disgorgement because—by design—it would give some Class Members more than they "lost."  Plaintiffs argue that an

1    amount representing the Class's "aggregate" restitution amount should be put into a

2    fund, so that MEF cannot "benefit[] from its wrongfully-obtained profits."  Pls.' Opp.

3    to MEF's Mot. for Decert. [Dkt. 196] p. 9.  But this is exactly what the California

4    Supreme Court rejected in *Korea Supply*:  "[W]e address whether disgorgement of

5    profits allegedly obtained by means of an unfair business practice is an authorized

6    remedy under the UCL where these profits are neither money taken from a plaintiff nor

7    funds in which the plaintiff has an ownership interest.  We conclude that disgorgement

8    of such profits is not an authorized remedy in an individual action under the UCL."  29

9    Cal. 4th at 1140.

10        Thus, where, as here, "the remedy sought by plaintiff . . . is not restitutionary

11   because plaintiff does not have an ownership interest in the money it seeks to recover

12   from defendants . . . the nonrestitutionary remedy that plaintiff seeks is not available

13   under the UCL, regardless of whether the claim is prosecuted as a class action."

14   *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1016 (2005)

15   ("The question here is whether the UCL permits nonrestitutionary fluid class recovery.

16   The answer is 'no.'").  Put another way, where a "specific form of relief is foreclosed

17   to claimants as individuals [here, nonrestitutionary disgorgement under the UCL], it

18   remains unavailable to them even if they congregate into a class."  *Id.*

19   **Fluid Recovery Here Does Not Comport With Rule 23, the Rules Enabling**

20   **Act, or Due Process.**  Plaintiffs' fluid recovery model also sanctions an impermissible

21   "Trial by Formula" in which Defendant "will not be entitled to litigate" its "defenses to

22   individual claims."  *Dukes*, 131 S. Ct. at 2561; *see also Duran*, 59 Cal. 4th at 34

23   ("Under [California law], just as under the federal rules, 'a class cannot be certified on

24   the premise that [the defendant] will not be entitled to litigate its statutory defenses to

25   individual claims.'" (quoting *Dukes*, 2561)).  "A defendant in a class action has a due

26   process right to raise individual challenges and defenses to claims, and a class action

27   cannot be certified in a way that eviscerates this right or masks individual issues."

28   *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013).

1        Thus, "[r]oughly estimating the gross damages to the class as a whole and only

2   subsequently allowing for the processing of individual claims"—as Plaintiffs propose

3   doing here on the behalf of the Class—"would inevitably alter defendants' substantive

4   right to pay damages reflective of their actual liability." *McLaughlin v. Am. Tobacco*

5   *Co.*, 522 F.3d 215, 231 (2d Cir. 2008).  For this reason, the Ninth Circuit has expressly

6   rejected fluid recovery:  "[A]llowing gross damages by treating unsubstantiated claims

7   of class members collectively significantly alters substantive rights . . . .  Such

8   enlargement or modification of substantive statutory rights by procedural devices is

9   clearly prohibited by the Enabling Act that authorizes the Supreme Court to

10  promulgate the Federal Rules of Civil Procedure." *In re Hotel Charges*, 500 F.3d at

11  90.  Nor may a "class . . . be certified that contains members lacking Article III

12  standing." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 596 (9th Cir. 2012).

13       Plaintiffs' methodology runs afoul of all of these principles.  Plaintiffs seek to

14  do away with the impossible task of determining for each Class Member (1) the actual

15  value of the massages they claim to have lost and (2) the actual value of the other

16  membership benefits that Class Members received, because doing so is not a simple

17  computerized procedure. *Cf. Leyva v. Medline Indus.*, 716 F.3d 510, 515 (9th Cir.

18  2013) (court found that calculating damages for each class member was possible

19  through a computerized process).

20       Here, determining the appropriate amount of restitution for each Class Member

21  would take countless individualized inquiries as to the value of the other services that

22  the Class Member enjoyed, as well as individual Class Member's valuation of the

23  "lost" massages (which in some cases could be zero).  Take, for instance, a

24  hypothetical Class Member whose primary purpose in paying the membership

25  payment each month may have been to receive discounts on products or services.  If

26  that Class Member had brought an individual claim against MEF, then MEF would

27  have a due process right to defend itself by proving the amount of benefits obtained

28  relative to that Class Member's valuation of the "lost" massage.  Hernandez and

1   Duncan are each an example of Class Members who are entitled to no restitution.

2   There are numerous other unknown Class Members who also are not entitled to any

3   restitution.  Plaintiffs cannot deprive MEF of the ability to defend itself against that

4   individual's claim by aggregating a restitution award through the class action device.

5   *See Ortiz*, 527 U.S. at 845 (noting "the [Rules Enabling] Act's mandate that [use of

6   Rule 23] 'shall not abridge, enlarge or modify any substantive right.'").

7       Instead of following the principles necessary to protect due process, Plaintiffs

8   urge this Court to substitute the "'class as a whole' . . . for the individual members of

9   the class as claimants, [where] the number of claims filed is of no consequence and the

10   amount found to be due will be enormous."  *McLaughlin*, 522 F.3d at 232 (rejecting

11   fluid recovery).  Plaintiffs' proposal ignores the fact that certain Class Members who

12   were never injured (because they had no intention of ever using the "lost" massages)

13   may nonetheless impermissibly receive a monetary recovery.  *See Mazza*, 666 F.3d at

14   596.  As in *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th

15   Cir. 2013), Plaintiffs here portray the Class "as a large, unified group that suffered a

16   uniform, collective injury" that forces MEF "to defend [itself] against a fictional

17   composite without the benefit of deposing or cross-examining the disparate individuals

18   behind the composite creation" in order to determine the restitution, if any, to which

19   any of these particular disparate individuals may be due.  Contrary to Plaintiffs'

20   suggestion, "entering aggregate judgments . . . and then moving forward with an

21   individual claims process [does] not allay [these] concerns."  *See, e.g.*, *Hickory Secs.*

22   *Ltd. v. Rep. of Arg.*, 493 F. App'x 156, 160 n.2 (2d Cir. 2012).

23       The Court should therefore reject Plaintiffs' proposed fluid recovery model as

24   "an unconstitutional violation of the requirement of due process of law."  *McLaughlin*,

25   522 F.3d at 232 ("When fluid recovery is used to permit the mass aggregation of

26   claims, the right of defendants to challenge the allegations of individual plaintiffs is

27

28

lost, resulting in a due process violation.")).[19]  Moreover, even if the Court were to adopt Plaintiffs' fluid recovery as a damages theory that does not eliminate the need to determine whether Plaintiffs have sufficient Article III standing.[20] [Dkt. 39.]

With the rejection of Plaintiffs' proposed fluid recovery theory, MEF will be entitled to judgment in its favor:  Plaintiffs have not produced or disclosed any information concerning the amount of restitution to which each Class Member is entitled, have not provided a restitution model to use to calculate such restitution on a class-wide basis and have not provided a workable trial plan as discussed above.

### G.   Appropriate Offsets Must Be Determined Before Plaintiffs Are Entitled to Any Monetary Restitution Award

For the reasons set forth above, MEF should never have any burden of proof at trial with respect to the amount of the appropriate offsets:  Plaintiffs cannot prove the amount of restitution to which each Class member should be entitled.  If the Court

---

[19] Plaintiffs rely on *Corbett v. Superior Court*, 101 Cal. App. 4th 649 (2002), to support their contention that this Court may order MEF to pay an "aggregate restitution amount" and then put that amount in a fund for the Class, regardless of whether the individual Class Members are able to prove their entitlement to any particular amount of restitution. Pls. Opp. to MEF's Mot. for Decert. [Dkt. 196]p. 9.  Plaintiffs' reliance is misplaced.  As the Court of Appeal later clarified in *Feitelberg*, "[t]he fluid recovery mechanism does not enlarge the remedies available under the applicable substantive law." 134 Cal. App. 4th at 1015.  Thus, "[u]nder the logic and compulsion of *Korea Supply*, we conclude that nonrestitutionary disgorgement is not available to a private plaintiff, regardless of the nature of the UCL proceeding as a class action."  *Id.* at 1020.  Moreover, even if California law did permit nonrestitutionary disgorgement in class actions—such that an aggregate award could be placed into a fluid fund while depriving the defendant of the ability to contest the amount of an individual class members' recovery—this Court is bound by the Ninth Circuit's decision in *In re Hotel Charges*, which held that "fluid recovery" was improper because it significantly altered a party's substantive rights in violation of the Rules Enabling Act. 500 F.2d at 90 ("allowing gross damages by treating unsubstantiated claims of class members collectively significantly alters substantive rights"); *see also Duran*, 59 Cal. 4th at 34 ("We have long observed that the class action procedural device may not be used to abridge a party's substantive rights. 'Class actions are provided only as a means to enforce substantive law. Altering the substantive law to accommodate procedure would be to confuse the means with the ends—to sacrifice the goal for the going.'"); *cf. Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) (finding that Rule 23 trumped a state law prohibiting certain class actions); *Hanna v. Plumer*, 380 U.S. 460, 473 (1965) ("Erie and its offspring cast no doubt on the long-recognized power of Congress to prescribe housekeeping rules for federal courts even though some of those rules will inevitably differ from comparable state rules.").

[20] Accordingly, as indicated above, MEF intends to again separately raise the issue of Plaintiffs' lack of standing at trial.

1  were to accept Plaintiffs' aggregation theory – which it should not do, because so

2  doing would constitute reversible error – such that MEF is required to introduce

3  evidence to counter Plaintiffs' improper aggregation theory, MEF in turn should be

4  entitled to introduce evidence demonstrating that in the aggregate, as discussed above

5  in Part III.H and V.E.3, the Class has benefited in excess of $███ million from their

6  memberships more than they paid in membership dues.  Accordingly, even if

7  Plaintiffs' aggregation restitution theory is adopted, the Class is not entitled to any

8  restitution: the Class collectively has not suffered any loss for which "restoration" is

9  necessary.[21]

10  ## H.    Any Monetary Restitution Award Cannot Exceed the Royalty
         Amount That MEF Received

11

12       In general, "the restitution awarded to class members must correspond to a

13  measurable amount representing the money that the defendant has acquired from each

14  class member by virtue of its unlawful conduct."  *Caldera*, 2014 WL 1477400; *Madrid*

15  *v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 454 (2005) ("Restitution is measured by

16  defendants' wrongful gain, not [plaintiff]'s loss.").  Thus, Plaintiffs may not recover

17  more from MEF than it received as a consequence of the membership agreements'

18  terms.[22]  *People v. Sarpas,* 225 Cal. App. 4th 1539 (2014); *Madrid,* 130 Cal. App. 4th

19  at 454 ("plaintiff fails to cite any authority that a UCL plaintiff may recover money

20  from a defendant who never received it on a theory that the defendant conspired with

21  or aided someone else who did receive it").

22  _____

[21] MEF makes this argument and proffers this evidence in the alternative so that it itself
23  is not precluded from introducing evidence in the aggregate should the Court adopt
    Plaintiffs' misplaced aggregation theory.  By making this argument, MEF in no way
24  intends to adopt or endorse Plaintiffs' aggregation theory as it is fundamental flawed
    for the numerous reasons discussed herein and MEF expressly reserves its appellate
25  rights should the Court adopt Plaintiffs' aggregation theory. If the Court were to adopt
    Plaintiffs' aggregation theory but then refuse to allow MEF to introduce evidence of
26  offsets in the aggregate, this would be fundamentally unfair, a violation of MEF's due
    process rights and reversible error.
27  [22] MEF acknowledges that the Court previously found that it could be liable for more
    than it received.  (MSJ Order, p. 26).  As this is such a departure from existing case
28  law, MEF asks that this issue be revisited following the introduction of evidence at
    trial.  And, in any event, expressly reserves its appellate rights with respect to this
    issue.

*Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305 (2009), does not dictate a contrary result as suggested in the MSJ Order at 26-27.  In *Troyk*, the plaintiffs sought restitution from the defendant insurance company of service charges paid to the insurance company's servicer.  Although the class members did not pay the service charges directly to the insurance company, the servicer was a *wholly owned subsidiary* of the defendant insurance company.  *Id.* at 1340.  Thus, the court found that a "substantial portion" of the service charges paid by the class members to the servicer was nevertheless "indirectly received" by the defendant.  *Id.*  What is more, the court found "substantial evidence" that the insurance company and servicing company were a "single enterprise" under California's test to invoke the alter ego doctrine.  *Id.* at 1341-42.  On this basis, the court concluded that the class members' payments could be treated as if paid to the defendant insurance company.  *Id.* at 1340.  The facts here could not be more different.

Plaintiffs have not proved and cannot prove that MEF and its independently owned and operated California franchisees are a "single enterprise."  Indeed, the evidence is to the contrary: MEF and the California franchisees do not commingle funds, they do not comingle assets, there is no identical equitable ownership between MEF and any of the California franchisees, they do not use the same offices or employees, there is no disregard of corporate formalities, and there is no identity of directors and officers.  *See id.* at 1341-42.  The California franchisees are not MEF's subsidiaries and MEF did not receive any financial benefit beyond a 5-6% royalty from them (which Plaintiffs have not proved is attributable to any losses sustained by the Class and of which MEF only retained only 40%).

It is undisputed here that Plaintiffs paid monthly dues and paid-in-full memberships to their Home Clinics.  Plaintiffs did not pay any membership dues directly to MEF.  Instead, MEF merely received a 5% or 6% royalty payment from its independently owned and operated California franchises with respect to membership dues Home Clinics collected arguably attributable to the Class Members' expired

monthly massages, and then only retained 2-3% (or 40%) of the royalties received, with the remainder going to the California Regional Developers.  MEF received and retained *no other funds*—directly or indirectly—from Plaintiffs.[23]

For these reasons, to the extent that Plaintiffs establish that they are entitled to any monetary restitution award, MEF cannot be ordered to fully pay the Class in an amount that exceeds the amount of royalties MEF received and retained that Plaintiffs prove are attributable to the Class's "lost" massages.

## I.   Plaintiffs' Lack of a Class-wide Restitution Model and Failure to Prove Each Requirement in Rule 23 (including Typicality and Predominance) Warrants Decertification

Plaintiffs bear the burden of showing that each requirement in Rule 23(a) and at least one of the conditions of Rule 23(b) have been met. *Vinole v. Countrywide Home Loans*, 246 F.R.D. 637, 640 (S.D. Cal. 2007). Here, Plaintiffs cannot carry their burden. For example, the individual facts applicable to each Plaintiff, as discussed above, demonstrate that Plaintiffs cannot establish typicality. Moreover, Plaintiffs cannot proffer a model for class-wide recovery consistent with substantive law and susceptible of proof on a class-wide basis to satisfy Fed. R. Civ. P. 23(b)(3)'s predominance requirement. *Comcast*, 133 S. Ct. at 1433. Accordingly, following introduction of evidence, decertification will be necessary.[24]  *See id.*; *In re POM Wonderful LLC,* 2014 WL 1225184 at *3; *Akkerman*, 152 Cal. App. 4th at 109 (rejecting UCL/FAL class that would have resulted in "windfall" to class members who received benefits); *In re Google Ad Words Litig*., 2012 WL 28068, at *15

---

[23] MEF acknowledges that the Court previously found that MEF could be liable for the full amount of any restitution to which Plaintiffs may be entitled.  (MSJ Order, p. 26.) MEF disagrees that it is or can be liable for the full amount of any restitution to which Plaintiffs may be entitled under either *Sarpas*, 225 Cal. App. 4th 1539 or *Troyk*, 171 Cal. 4th 1305 or any other case law.  (*See* MEF's MSJ [Dkt. 195] and Reply [Dkt. 225]).  MEF expressly preserves this issue for appeal.

[24] MEF intends to separately file another decertification motion as this issue can be raised at any time.  *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 633 (9th Cir. 1982) ("[B]efore entry of a final judgment on the merits, a district court's order respecting class status is not final or irrevocable, but rather, it is inherently tentative."). MEF also separately intends to again raise Plaintiffs' lack of standing to ensure that these issues are preserved for appeal.

(rejecting UCL/FAL class because the "amount of restitution due must account for the benefits received."); *Ries*, 2013 WL 1287416 at *7 (decertifying class after plaintiffs failed to establish restitution accounting for value received).

### J.      Plaintiffs Cannot Meet Their Burden That They Are Entitled to Injunctive Relief

To obtain their request for "an injunction prohibiting Defendant's forfeiture of massages," (FAC, Prayer for Relief), Plaintiffs must prove the following:  "1) The existence of irreparable injury (including a continuing and imminent threat of harm); 2) remedies at law are inadequate to compensate for that threat of harm; 3) whether the balance of hardships between plaintiff and defendant tips in favor of a remedy in equity; and 4) the public interest would not be disserved by a permanent injunction." *Bowler v. Home Depot USA Inc.*, C-09-05523 JCS, 2011 WL 166140, *3 (N.D. Cal. Jan. 19, 2011).  Plaintiffs patently cannot meet this burden.

**Plaintiffs Cannot Prove There is a Continuing and Imminent Threat of Harm**.  Plaintiffs' burden is to demonstrate the threat of future harm is immediate, not a mere possibility, and "sufficiently likely to reoccur in the future." *Id.*  Plaintiffs cannot meet this burden by relying upon a "subjective showing." *Id.*; *Preiser v. Newkirk*, 422 U.S. 395, 402-03, 95 S. Ct. 2330, 45 L. Ed. 2d 272 (1975) (in context of mootness, plaintiff's subjective fear that the injury might reoccur not sufficient to demonstrate capability of repetition of an injury).  At best, Plaintiffs may offer at trial their opinion on the language of future membership agreements and membership services redemption.  Plaintiffs will be unable to offer anything more than a subjective belief regarding future membership agreement-related issues and policies and how MEF may choose to revise or modify its membership agreement templates offered to its California franchises.  Such subjective showing will be insufficient for Plaintiffs to meet their burden. *Bowler*, 2011 WL 166140 at *4 (finding even introduction of expert testimony to be insufficient to "demonstrate any real risk of a similar accident occurring in the immediate future").

1   **The Balance of Hardships Weighs Against Plaintiffs**.  Because Plaintiffs

2   cannot demonstrate any real risk of ongoing or future harm, the balance of hardships

3   weighs in MEF's favor.  *Bowler*, 2011 WL 166140 at *5.  Moreover, a permanent

4   injunction would essentially require the Court to re-write the template membership

5   agreements and MEF's policies regarding Home Clinic's discretion in modifying

6   provisions of the membership agreements, as well as to continually monitor the

7   independently owned and operated California franchise's use of the membership

8   agreements.  Such prolonged, continual judicial involvement in the daily business of

9   MEF and its California franchises is unwarranted and overly burdensome in these

10  circumstances.  *Id.* (finding injunction that "would require the Court to engage in

11  investigation, testing and monitoring" to be unnecessary and not required).

12      Even if MEF is enjoined with respect to the content of future template

13  membership agreements, Plaintiffs have not proved that MEF has anyway to monitor

14  its California franchises' use of any template membership agreement; indeed, the

15  evidence demonstrates that some of the franchises frequently modify any template

16  membership agreements that MEF has made available.  For example, two of the three

17  Plaintiffs' membership agreements use the term "prepaid massages" but none of

18  MEF's template membership agreements contain this term.

19      **K.     Plaintiffs Are Not Entitled to Prospective Injunctive Relief**

20      Further, to the extent Plaintiffs are able to meet their burden, any injunctive

21  relief is necessarily limited to prospective relief.  The FAC is clear that Plaintiffs seek

22  "an injunction prohibiting Defendant's forfeiture of massages."  FAC, Prayer for

23  Relief; *see also* Pls' Motion for Summary Judgment [Dkt. 175], pp. 26-27 ("Thus, the

24  only issues remaining for trial is the *quantum* of restitution or other remedies available

25  to the Class, such as reinstatement of forfeited massages and injunctive or declaratory

26  relief prohibiting future forfeitures pursuant to the terms of the Membership

27  Agreement.").  Further, the very nature of injunctive relief is that it "operates in the

28  future."  6 Witkin, Cal. Procedure (4th ed. 1997) Provisional Remedies, § 399, p. 324

1    ("Because relief by injunction operates in the future, appeals of injunctions are

2    governed by the law in effect at the time the appellate court gives its decision").

3    Whether to grant or deny a request for a permanent injunction is within the Court's

4    equitable discretion. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 338, 391 (2006).

5    The evidence will not warrant exercise of such discretion here.

6         Moreover, MEF is not involved in the franchises' day-to-day interaction with

7    members or discussions with members concerning membership-related issues

8    including, for instance, MEF has no involvement in the number of unredeemed

9    monthly massages available to a member, the time in which a member may redeem

10   monthly massages following membership conclusion or whether a franchisee in fact

11   tells a member unredeemed monthly massages are immediately "forfeited" upon

12   membership conclusion or gives the member additional time in which to use

13   unredeemed monthly massages.  Accordingly, even if Plaintiffs' requested injunction

14   precluding future prospective purported "forfeitures" is entered against MEF, Plaintiffs

15   have not proved it will serve any purpose as the franchises are not parties here and they

16   have not proved that MEF can cause – or prevent - any purported "forfeiture".  For this

17   additional reason, Plaintiffs are not entitled to any prospective injunctive relief.

18   **VI.    ABANDONED ISSUES**

19        Hahn has abandoned her personal claims for breach of the implied covenant of

20   good faith and fair dealing, violation of the "unfair" prong of the UCL, and her request

21   for a declaratory judgment.  MEF has not abandoned any issues and continues to

22   believe the Court erred in deciding summary judgment in Plaintiffs' favor on their

23   UCL claim, causation, and their ability to recover from MEF in restitution more than it

24   received [Dkt. 271].  MEF further believes that the Court erred in finding, among other

25   things, that Plaintiffs have standing to pursue their claims and that MEF's

26   independently owned and operated franchises are not indispensable parties [Dkt. 52],

27   certifying the class [Dkt. 160], denying MEF's decertification motion [Dkt. 271], and

28   denying MEF's motion to exclude Plaintiffs' expert, Thomas Neches [Dkt. 271].

## VII.   EXHIBITS

To prove its affirmative defenses and to defend against Plaintiffs' claims, MEF expects to offer at trial the exhibits listed as **Exhibit 1** hereto.  Pursuant to Local Rule 16.1(f)(2)(c), the exhibits do not necessarily include exhibits that MEF expects to offer as impeachment evidence although there is certainly a possibility of some overlap.

## VIII.  WITNESSES

To prove its affirmative defenses and to defend against Plaintiffs' claims, MEF expects to call at trial those witnesses listed on **Exhibit 2** hereto, excluding any necessary impeaching witnesses as permitted by Local Rule 16.1(f)(2)(d).

## IX.   CONCLUSION

Based on the evidence MEF will offer at trial to support the facts set forth above and the law in MEF's favor, MEF requests that after trial this Court enter a judgment awarding Plaintiffs nothing.

Dated:  October 24, 2014

SACKS, RICKETTS & CASE, LLP

By  s/Cynthia A. Ricketts
　　LUANNE SACKS
　　Email: lsacks@srclaw.com
　　CYNTHIA A. RICKETTS
　　Email: cricketts@srclaw.com
　　Attorneys for Defendants
　　Massage Envy Franchising, LLC

Additional counsel for Defendant:

THEODORE J. BOUTROUS, JR. (CA SBN 132099)
 (*Application for admission to S.D. Cal. pending*)
tboutrous@gibsondunn.com
KAHN A. SCOLNICK (CA SBN 228686)
kscolnick@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 S. GRAND AVENUE
LOS ANGELES, CA  90071
PHONE: (213) 229.7000
Fax: (213) 229.7520

Kathleen M. Sullivan (CA SBN 242261)

1   *(Application for admission to S.D. Cal. forthcoming)*
    kathleensullivan@quinnemanuel.com
2   **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
    555 Twin Dolphin Drive, 5th Floor
3   Redwood Shores, California  94065-2139
    Telephone:  (650) 801-5000
4   Facsimile:   (650) 801-5100

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28